JOHN O. ELIKER AND DONNA J. ELIKER, HUSBAND AND WIFE, APPELLEES, V. CHIEF INDUSTRIES, INC., APPELLANT.

498 N.W.2d 564

Filed April 23, 1993.   No. S-90-564.

Douglas L. Kluender, of Healey Wieland Law Firm, for appellant.

No appearance for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

HASTINGS, C.J.

John O. and Donna J. Eliker brought this action to obtain rescission of a home construction contract entered into with Chief Industries, Inc. The district court found that the plaintiffs were entitled to rescission of the contract, together with repayment of sums which they had expended on the house, and relief from the existing mortgage. The court further ordered that upon rescission of the contract and the making of the required repayments, the defendant was entitled to a quitclaim deed to the property from the plaintiffs.

An action to rescind a written instrument is an equity action. *Kracl v. Loseke*, 236 Neb. 290, 461 N.W.2d 67 (1990); *Christopher v. Evans*, 219 Neb. 51, 361 N.W.2d 193 (1985).

On appeal from the district court to an appellate court, an equity case is tried as to factual issues de novo on the record, requiring the appellate court to reach a conclusion independent of the findings of the trial court. However, when credible evidence conflicts, the appellate court may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Helvey v. Dawson Cty. Bd. of Equal.*, 242 Neb. 379, 495 N.W.2d 261 (1993); *Dowd v. Board of Equal.*, 240 Neb. 437, 482 N.W.2d 583 (1992).

On February 15, 1984, the Elikers entered into a contract

with Chief Industries for the purchase of a new home. The Elikers moved into the home on May 27, 1984, and immediately began to notice defects in material and workmanship. Apparent defects, inter alia, included a cracked driveway; drain tile which allowed water to drain into the garage; numerous exterior foundation cracks; an exterior wall which was bowed inward 1 to 2 inches; water seepage in the basement and garage; numerous severe cracks in the basement walls, including one which allowed daylight to show through; wooden center beams which extended through the concrete floor into the earth, as a potential source for termite infestation; doors which were out of alignment; drywall with extreme horizontal cracking and buckling; a large crack located in the center of the living room ceiling extending down the west wall of the house; and a living room floor which was separating into two halves, with the resulting two floor levels on different planes.

A registered land surveyor who surveyed the property testified that the foundation was not square, the house was not square, and the foundation was not level. Building contractor Lawrence Peterson testified that he had inspected the house and estimated that it would cost $23,477.25 to do the necessary repairs. A licensed real estate appraiser, Stanley Trampe, stated that his inspection of the property revealed it would be necessary to spend a minimum of $18,500 for repairs and that even after the repairs were accomplished the house would have limited marketability because of the inherent structural defects. Chief Industries' director of purchasing stated that the repairs that he believed were necessary could be done for less than $5,500 and would not include foundation repairs.

The district court found that the cost of repair, when added to the present value of the home, exceeded the value of the home after that repair and that the plaintiffs were entitled to rescission. Chief Industries asserts that the district court erred in holding that rescission was an appropriate remedy for a construction contract.

Chief Industries asserts that the proper remedy for breach of a construction contract may be found in the language of this court in *Moss v. Speck*, 209 Neb. 46, 48, 306 N.W.2d 156, 157 (1981):

> [W]here defects in materials, construction, or workmanship are remediable without materially injuring or reconstructing any substantial portion of the building, the measure of damages is the cost of remedying the defects, but where the defects cannot be remedied without reconstruction of or material injury to a substantial portion of the building, the measure of damages is the difference between the value as constructed and the value if built according to the contract.

Chief Industries also contends that while rescission of a contract is allowable in certain circumstances, it is an extreme remedy available only where damages cannot be utilized to compensate the plaintiffs for their loss.

Grounds for cancellation or rescission of a contract include, inter alia, fraud, duress, unilateral or mutual mistake, and inadequacy of consideration, which may arise from nonperformance of the agreement. See 13 Am. Jur. 2d *Cancellation of Instruments* § 23 (1964). Although failure of consideration is not generally considered a sufficient ground for equitable cancellation of a contract, a ground for equitable cancellation may arise from a breach of contract which is so substantial and fundamental as to defeat the object of the parties in entering into the contract. *Id.*

In *Klapka v. Shrauger*, 135 Neb. 354, 361, 281 N.W. 612, 616 (1938), this court discussed the general rule:

> "It is not every breach of a contract or failure exactly to perform—certainly not every partial failure to perform—that entitles the other party to rescind. A breach which goes to only a part of the consideration, is incidental and subordinate to the main purpose of the contract, and may be compensated in damages does not warrant a rescission of the contract; the injured party is still bound to perform his part of the agreement, and his only remedy for the breach consists of the damages he has suffered therefrom. A rescission is not warranted by a mere breach of contract *not so substantial and fundamental as to defeat the object of the parties in making the agreement.*"

(Emphasis supplied.)

Substantial performance of a building contract exists where all of the essentials necessary for the full accomplishment of the purposes of the contract have been performed with such approximation to complete performance that the owner obtains substantially what is called for by the contract. *Jones v. Elliott*, 172 Neb. 96, 108 N.W.2d 742 (1961). Such was not the case here.

The Iowa Court of Appeals, in *Folkers v. Southwest Leasing*, 431 N.W.2d 177, 181 (Iowa App. 1988), quoting *The Maytag Co. v. Alward*, 253 Iowa 455, 112 N.W.2d 654 (1962), stated:

"There is no hard and fast rule on the subject of rescission, for the right usually depends on the circumstances of the particular case. It is permitted for failure of consideration, fraud in making the contract, for inability to perform it after it is made, for repudiation of the contract or an essential part thereof, and *for such a breach as substantially defeats its purpose.* It is not permitted for a slight, casual, or technical breach, but, as a general rule, *only for such as are material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.* Failure to perform in every respect is not essential, but a failure which leaves the subject of the contract substantially different from what was contracted for is sufficient."

Although Chief Industries asserts that the proper remedy for breach of a construction contract is damages rather than rescission, the existing case law does not preclude the application of an equitable remedy where a breach of the contract is so substantial that it defeats the object of the parties in entering into the agreement. Where damages are inadequate, or inordinately difficult to assess, the equitable remedy may apply. As stated in *Moss v. Speck*, 209 Neb. at 48, 306 N.W.2d at 157, in an action at law, damages may be measured by "the cost of remedying the defects" or by "the difference between the value as constructed and the value if built according to the contract." However, the court further noted:

The latter rule contemplates instances where the contract

has been substantially complied with, *the structure as completed will serve substantially as well as would the structure if completed according to the contract*, and completion in accord with the contract terms would either endanger the balance of the structure or be possible only at inordinate cost.

(Emphasis supplied.) *Id*.

In evaluating these alternative remedies in light of the facts of the instant case, it is instructive to note that the district court found that "the cost of repair, when added to the present value of the home, exceeds the value of the home after that repair." Implicit in that conclusion, which is amply supported by the record, is the finding that the necessary repairs could not be accomplished for less than $5,500, as Chief Industries contends, but, rather, would cost in the range of $18,500 to $23,500, as estimated by a licensed real estate appraiser and a building contractor, respectively. Both of the latter estimates contemplated extensive renovation. The building contractor testified that in order to remedy the defects he would first replace the foundation and basement floor, which would require "jacking up the house" while the excavation was done on the outside and the concrete removed. He also stated that the Elikers would have to move out of the house for 6 weeks while the repairs were accomplished. Although the real estate appraiser's estimate did not include a new foundation, he enumerated many significant repairs which would be necessary, including such items as stabilization of the roof, new drywall, installation of steel jacks in the basement, leveling of the living room floor and rebolting the center beam, excavation around the outside perimeter and installation of new drain tile, and raising the house to replace a load-bearing wall between the garage and the basement. Thus, the first measure of damages, the cost of remedying defects, is not applicable, since reconstruction of a substantial portion of the building would be required. The alternative measure of damages, applicable when the defects cannot be remedied without reconstruction of, or material injury to, a substantial portion of the building, is not appropriate when the structure *as completed* will not serve substantially the same purpose as if it had been completed

according to the contract. From an examination of the record, it is clear that the structure, as completed, does not serve the same purpose as it would have if completed according to the contract.

In *Whiteley v. O'Dell*, 219 Kan. 314, 548 P.2d 798 (1976), the defendant agreed to construct a house for the plaintiffs which was similar to another house he had built. While construction of the house was still in progress, the plaintiffs became aware that the contractor was not complying with certain contract specifications. For example, the builder used sealdown shingles rather than the T-lock shingles which the plaintiffs had specifically ordered, and the defendant did not offer to replace them. In addition, the contract specified that the house was to be all brick, but the plaintiffs discovered that brick veneer was added only to the front and that the ledge necessary to support the brick veneer had been omitted on three sides of the house. Although the defendant attempted to remedy this problem by laying cement blocks where the ledge should have been extended from the foundation, a construction expert testified that the use of this method could cause an unequal bearing on the footings of the house. The Supreme Court of Kansas noted the general rule that in order to warrant rescission, a breach must be material and the failure to perform so substantial as to defeat the object of the parties in entering the agreement. The court found that compliance with the specifications was important to the plaintiffs, that the failure to include a ledge on three sides of the house and the use of the wrong shingles constituted a present material breach of the contract, and that these substantial variations "obviously should entitle the purchaser to rescind the contract." 219 Kan. at 318, 548 P.2d at 802.

In the instant case, the variations between the house that the Elikers bargained for and the structure as completed were egregious. The record contains numerous instances of defects in material and workmanship; for example, the contract provided that steel floor jacks were to be installed in the basement; instead, 4 by 4 wood columns were used and extended through the floor, exposing them to moisture and potential problems of rotting and termites. Real estate appraiser Trampe also testified

that the dividing wall between the garage and the basement was built on the concrete floor, with no moisture barrier. Trampe stated that the load-bearing wall, exposed to constant moisture in the garage, would rot and provide a perfect habitat for termites.

Undoubtedly, the Elikers, or any purchaser, would not bargain for the purchase of a new home with a design which would cause it to split in half at both the floor and the ceiling. Chief Industries' director of purchasing, Jack Henry, admitted that the house had a faulty design, that the workmanship was substandard, and that prior to the Elikers' complaint, he was aware of the problem of the ceiling crack because it had appeared in other houses in the subdivision. When Henry was questioned about the appearance of the ceiling as he proposed to repair it, he was asked: "Q. Did the model home that they looked at, at the time they looked at it, have that ceiling? A. At the time that they looked at it, it did not. Q. Was it cracked? A. I don't know if it was cracked when they looked at it."

Thus, the Elikers were apparently unaware that their new home would require extensive repair to the ceiling.

In his deposition, real estate appraiser Richard Keith testified that he had inspected the Elikers' property on May 2, 1985, and again on February 13, 1990. It was Keith's opinion that the property had significantly deteriorated during that period of time. Keith stated that the problems which he observed in the home were mostly structural, and when asked to define structural, he responded:

> Well, the basis of any improvement on real estate is the foundation it sets on. And if that is not correct and enduring, there's no way the improvement can ever reach a typical economic life. And for some reason, it seems that everything points back to the foundation on this problem for the major problems that are not cosmetic, and that it continues to deteriorate with no stabilization.

On cross-examination, Keith was also asked if the house was "totally uninhabitable," to which he replied:

> I think to answer that question I would have to establish some relationship of the term uninhabitable. Having worked in an eminent domain work, being associated with

relocations programs over the years at the Department of Roads and on the federal level, it would be my opinion of having worked in those programs that the property would not be adjudged a decent, safe and sanitary home for a relocatee from one of those projects.

Although the Elikers purchased the house for $52,195, at the time of trial real estate appraiser Trampe estimated its value at $35,500 for an investor-type buyer. He agreed that repairs alone would not materially improve the situation. He testified in part:

Once again, I've said that this is an investor-type house only at this point in time. Now, when an investor is going to buy this house, he's buying it for one reason, profit. At the same time, investors that deal in houses have one golden rule: Do not touch anything that has structural or plumbing defects, 'cause you don't know what you're going to get into. Your costs are going to go up to try to fix 'em up. If you don't fix 'em up right — and that's what concerns me about my estimate here — If you don't fix 'em up right, there is a continuing liability that's going to go with that house if you ever sell it. So, really, my $18,500 I'm referring to, is a minimum not a maximum that this could cost.

Trampe also stated that problems with the house could very possibly continue, because the majority of the problems were caused by the foundation wall, and that the Elikers would probably end up spending more money than his estimate of what an investor would need to spend.

In *Bernstein v. Ainsworth*, 220 Neb. 670, 371 N.W.2d 682 (1985), homeowners sought recovery for damages to their home resulting from the overflow of a manmade lake. This court found that the petition failed to state a cause of action against the developer who sold a vacant lot to the vendors, but noted:

[The plaintiffs] equate the implied warranty that some courts have held exists between the builder of a house and the buyer of that house to the sale of a lot to a buyer who contracts with another to build a house on the lot. Nebraska has adopted the builder-vendor rule in *Henggeler v. Jindra*, 191 Neb. 317, 214 N.W.2d 925

(1974). In the *Henggeler* case we held "As a general rule a contractor constructing a building impliedly warrants that the building will be erected in a workmanlike manner and in accordance with good usage and accepted practices in the community in which the work is done." *Id*. at 319, 214 N.W.2d at 926.

220 Neb. at 676, 371 N.W.2d at 687.

Other jurisdictions have found rescission to be justified where there has been a substantial breach of the implied warranty of habitability. In *Finke v. Woodard*, 122 Ill. App. 3d 911, 462 N.E.2d 13 (1984), the plaintiffs sought damages and an order of rescission as a result of defects in a new home built and sold by the defendant. Defects included improperly installed appliances, interior walls which were weak and separated from the ceiling, doors which would not close, a crack which developed in the concrete floor of an outside storage shed, and a malfunctioning septic system. While noting that not every breach will warrant the extraordinary remedy of rescission, the court found that the evidence suggested that the breach of the implied warranty of habitability was substantial and justified rescission, stating:

" ' "[A] party may terminate or rescind a contract because of substantial nonperformance or breach by the other party." [Citation.] "A total breach of contract is a nonperformance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." (A. Corbin, Contracts sec. 946, at 925 (1952).) Whether or not a breach is material and important is a question of degree which must be answered by weighing the consequences of the breach in light of the actual custom of persons in the performance of contracts similar to the one involved in the specific case. A. Corbin, Contracts sec. 946, at 925 (1952).' "

122 Ill. App. 3d at 916, 462 N.E.2d at 17 (quoting *C. G. Caster Co. v. Regan*, 88 Ill. App. 3d 280, 410 N.E.2d 422 (1980)).

Similarly, in *Wall v. Foster Petroleum Corp.*, 791 P.2d 1148 (Colo. App. 1989), rescission was found to be an appropriate remedy. In *Wall*, the plaintiff discovered that water had seeped into his basement and cracks had developed in the basement

slab and upper portions of the house; he later learned that the house was situated on a type of soil that expanded when mixed with water, putting pressure on the foundation and other structural components. The defendant argued, as in the instant case, that the house could be repaired and that, therefore, the plaintiff was entitled to damages rather than rescission. The court stated:

> Here, defendant was neither negligent in building the house nor fraudulent in its representations. However, this implied warranty arises because the builder-vendor holds himself out as having the expertise to construct a livable dwelling . . . and rescission is an appropriate remedy for misrepresentation, even if the seller does not realize the falsity of the misrepresentation. . . .
>
> Generally, rescission may be granted if the facts show that there is a substantial breach, that the injury caused is irreparable, or that damages would be inadequate, difficult, or impossible to assess. . . . Here, the evidence supports the trial court's determination that the breach was substantial and the damage was incurable. Additionally, given the ongoing nature of the problem, damages would be difficult, if not impossible, to assess. Accordingly, rescission of the contract is warranted.

(Citations omitted.) 791 P.2d at 1150.

The purchaser of a new home expects it to be, at the very least, structurally sound and habitable. The purchaser should also not be faced with the virtual impossibility of resale because of the home's latent defects. We hold that rescission is the proper remedy where a breach of contract is so substantial and fundamental as to defeat the object of the parties in making the agreement, so that it leaves the property bargained for uninhabitable for all practical purposes. The record supports such a conclusion in this case, and the record establishes that the defendant breached its duty to construct a house reasonably fit for its intended use. Because damages would be an inadequate remedy, rescission is the appropriate remedy, and the district court was correct in awarding that remedy.

AFFIRMED.