LANGE INDUSTRIES, INC., FORMERLY KNOWN AS LANGE BUILDING
AND FARM SUPPLY, INC., APPELLEE AND CROSS-APPELLANT, V.
HALLAM GRAIN CO., A NEBRASKA CORPORATION, APPELLANT AND
CROSS-APPELLEE, AND FIRSTIER BANK OMAHA, FORMERLY KNOWN
AS FIRST NATIONAL BANK OF OMAHA, A NATIONAL BANKING
ASSOCIATION, APPELLEE.

507 N.W.2d 465

Filed November 5, 1993.    No. S-91-548.

Robert B. Creager, of Berry, Anderson, Creager & Wittstruck, P.C., for appellant.

Siegfried H. Brauer III, of Ross, Schroeder, Brauer & Romatzke, and John W. Ballew, Jr., of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee Lange Industries.

HASTINGS, C.J., BOSLAUGH, WHITE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ., and RONIN, D.J., Retired.

FAHRNBRUCH, J.

Hallam Grain Co. (Hallam) appeals the entry of a construction lien foreclosure in favor of Lange Industries, Inc. (Lange), based upon the district court's finding that Lange had substantially performed its agreement to build a $510,000

four-bin grain elevator facility for Hallam. The grain company had filed six counterclaims at law.

After taking into account various credits and charges, the district court for Lancaster County found that Hallam owed Lange a net balance of $56,203.25 in its foreclosure action, but reduced that amount by $1,464.30 for repairs and modifications to a dump pit because Lange had not properly designed it. Counterclaims or, in the alternative, setoffs, except one for repairs and modifications of the dump pit, requested by Hallam were dismissed.

## I. ASSIGNMENTS OF ERROR

In its assignments of error, Hallam claims that the district court erred in (1) improperly allocating the burden of proof on the issue of "substantial performance," (2) finding that Lange had substantially performed the construction contract, (3) finding that Hallam was liable for "site preparation" and for repair and replacement of a conveyor belt, (4) failing to admit Hallam's evidence of damages regarding its counterclaim, (5) failing to award Hallam setoffs for repairs it made to the facility, (6) failing to award Hallam damages for damaged grain, and (7) considering Lange's "manufacturer's warranty defense" and evidence of a design defect in the failed bins.

In its cross-appeal, Lange claims that the trial court erred in denying it prejudgment interest and in awarding Hallam $1,464.30 on its counterclaim for modifications to the dump pit.

We affirm the judgment of the district court for Lancaster County.

## II. STANDARD OF REVIEW

An action to foreclose a construction lien is one grounded in equity. *Mid-America Maintenance v. Bill Morris Ford*, 232 Neb. 920, 442 N.W.2d 869 (1989). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts

rather than another. *Mid-America Maintenance, supra;* *O'Keefe Elevator v. Second Ave. Properties,* 216 Neb. 170, 343 N.W.2d 54 (1984).

A suit for damages arising from breach of a contract presents an action at law. *Fisbeck v. Scherbarth, Inc.,* 229 Neb. 453, 428 N.W.2d 141 (1988). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. *Broekemeier Ford v. Clatanoff,* 240 Neb. 265, 481 N.W.2d 416 (1992); *Nebraska Builders Prod. Co. v. Industrial Erectors,* 239 Neb. 744, 478 N.W.2d 257 (1992). As pled, Hallam's counterclaims or, in the alternative, requests for setoffs are claims for damages arising from the alleged breach of a contract.

Therefore, this court must review Lange's foreclosure suit de novo and Hallam's counterclaims under the "clearly erroneous" standard.

## III. FACTS

On June 21, 1986, Hallam entered into a written agreement, consisting of three purchase orders, with Lange for Lange to construct a $510,000 four-bin grain elevator facility for Hallam. A change order, dated October 6, 1986, provided some relatively minor changes at a cost of $4,500.

Lange agreed to provide and erect (1) two Blount/MFS 48-foot-diameter bins and two Blount/MFS 60-foot-diameter bins with aeration fans and temperature cables in each bin, (2) a custom-built dump pit and boot pit with a 7,000-bushels-per-hour (b.p.h.) drag conveyor, (3) a leg support tower with platforms, (4) a swivel loadout spout with support tower, (5) a gravity 7,000-b.p.h. grain cleaner, (6) a Blount/York model 36-70 elevator leg 7,000 b.p.h., (7) 7,000-b.p.h. drag unloading conveyors, and (8) two 7,000-b.p.h. drag conveyors mounted on catwalks. Most of the parts were manufactured by MFS Blount/York (Blount), which company provided "working drawings" to Lange for the construction of the facility. Blount was not a party to the contract or a party to this litigation.

In addition to the list of parts, the purchase orders included typewritten provisions stating that a "clean level site is to be

provided by the buyer" and "electrical hook-up beyond the Main disconnect is included." Stricken from each purchase order was a preprinted provision stating, "Concrete, Electrical Wiring, Gas Hook-up, Fill Sand and Level Site to be furnished by the Buyer [Hallam]."

William Lange, president of Lange, testified that he and Melvin Holsing, president of Hallam, verbally agreed that to avoid water draining into the grain facility, the *floor* of the grain bins should be 1 foot above the top of the railroad tracks which were located to the west of the construction site. Holsing testified that he wanted "*nothing* below 12 inches above the tracks." (Emphasis supplied.)

Apparently, there was a general understanding that Lange would attempt to have the bins ready to receive grain by the fall of 1986. Construction began in late June or early July 1986. Excavation of the site uncovered some concrete rubble and foundations. The rubble was removed by Lange and Beatrice Concrete, a company that had previously owned the site. By late September, Lange had constructed two 48-foot-diameter bins on the west side of Hallam's property, and Hallam began loading them with grain.

While loading the first bins, Holsing and his employees noticed that grain was "boiling over" in places and plugging the system. They found that various mechanisms in the system, including the leg, the boot pit shroud, and the upper spouts, were not operating properly. As a result, several adjustments were made to the system. Holsing testified he tested the system and determined that it was moving approximately 4,000 b.p.h. Holsing notified a Lange foreman, and a Blount representative was called. Blount's representative testified that he inspected the facility and found that "it was functioning as it was designed for." He said he attempted to test the system's capacity, but could not do so because of dirt collecting in the spouts of the distributor. He was to return later to conduct a capacity test, but never did.

Hallam claims that the capacity problem occurred because of Lange's poor workmanship in constructing the system. Henry Hollman, a local grain bin contractor, testified for Hallam as an expert witness. In his opinion, the spouts had not been angled

steeply enough to prevent the accumulation of grain and dust. William Lange testified that dirt and dust from the grain prevented the manufacturer's representative from conducting a capacity test. Lange also testified that he and his workers angled the spouts in accordance with the manufacturer's recommendations. Lange said that based on these instructions, he constructed the spouts steeply enough for the grain to flow but "not so steep that it would cause excessive grain damage." The manufacturer's instructions did not address how many bushels per hour would flow through the spouts at the recommended angles.

Lange eventually completed the two 60-foot-diameter bins, and Hallam also filled them with grain. Lange left the construction site December 22 or 23, 1986. Lange filed a construction lien on January 19, 1987, and then brought this action to foreclose.

William Lange acknowledged that when his crew left the Hallam site, several items had yet to be completed. Lange deducted the $1,985 cost of completing these items from the amount it claimed was due under the lien.

Hallam claims it owed Lange no further payments because Lange failed to substantially perform the contract between the parties. Hallam also counterclaimed against Lange, alleging six separate causes of action. Hallam's counterclaims (or, in the alternative, claims for setoffs) are based on problems that developed before and after Lange left the construction site. In addition to the bushels per hour "capacity" problem, Hallam's main complaints include:

(1) The unload augers from the two west bins were located less than 12 inches above the railroad tracks at the point where the augers entered the leg pit through a pipe. (Holsing testified that by the spring of 1986, water would leak through the pipe where the unload augers came into the pit, causing the operation to shut down.)

(2) The aeration fan motors were not timely connected to an electrical supply. (Holsing testified that he had to hire his own electrician, who connected the fan for bin No. 4 sometime around October 26 or 27, 1986. The electrician hired by Holsing testified that after he connected the fan for bin No. 4, someone

told him that he should leave because "they had their own contractor or own electrician." Holsing testified that some time in December, the fans for bins Nos. 1 and 2 became operational.)

(3) Upon unloading bin No. 4 in the fall of 1987, heat sensor cables manufactured by Rolfes broke off and became caught in the conveyor systems. (Heat sensor cables hang down into the bin at various locations and monitor the temperature of the stored grain. Holsing testified that each time the cables broke off, the system had to be shut down and the cables cut out. The same problem occurred when bin No. 3 was unloaded during March 1990. Holsing testified that cables broke off in bins Nos. 3 and 4 a total of 42 times.)

(4) Side draws supplied and installed by Lange malfunctioned after Lange left the Hallam construction site in December 1986. (A side draw is a valve that allows grain to be obtained from the side of the bin without elevating the grain through the auger system. Holsing testified that the cables on all the side draws fell off, so that the valves could not close to control the amount of grain that flowed out.)

(5) Bin No. 4 broke open at its seam about $1^1/8$ inches during the fall of 1988, and the bottom seam of bin No. 3 ruptured, spilling grain out of the bin's door. (Holsing testified that several other seams popped open and that a sheet of metal began to rip.)

## IV. ANALYSIS

### 1. LIEN FORECLOSURE

#### (a) Acceptance of Performance as Waiver

Lange argues that because Hallam used the elevator facility from September 1986 through the time of trial in early 1991, Hallam cannot avoid its obligations on the basis of defective or insubstantial performance. Lange argues that one of the conditions preprinted on the back of its purchase orders states: "(14) Occupancy or use of the building by purchaser before completion will constitute acceptance of the building and payment in full required at that time."

In *City of Gering v. Smith Co.*, 215 Neb. 174, 337 N.W.2d

747 (1983), we held that an express or implied acceptance of work as in compliance with a building contract operates as a waiver of defective performance, but this rule is inapplicable where the acceptance was under protest or induced by fraud, or where the defects were latent and unknown to the owner.

Hallam began elevating grain into the facility in late September 1986, before Lange completed construction of the facility. Holsing testified that he used the four grain bins and elevator system continuously from late September 1986 through the time of trial in early 1991. Under the rule in *City of Gering, supra*, this use of the facility does not necessarily constitute an "express or implied acceptance of work as in compliance with a building contract."

Holsing testified that Lange was told of the initial problems moving grain as soon as the problems arose. Holsing also said he talked repeatedly with a Lange foreman about the aeration fans' needing to be wired to the electrical supply. William Lange acknowledged that Holsing "was always wanting something done" and that Holsing complained primarily about "not getting bushel capacity out of the elevator." In light of these ongoing complaints and communications, Hallam's use of the facility did not imply that it had accepted the facility as being in compliance with the agreement so as to preclude an assertion of insubstantial performance. See, *Lofton v. Don J. Trahan, Inc.*, 399 So. 2d 818 (La. App. 1981); *O. W. Grun Roofing & Const. Co. v. Cope*, 529 S.W.2d 258 (Tex. Civ. App. 1975).

There was evidence that the facility suffered from latent defects, which surfaced only after Hallam began using the facility and after Lange had left the construction site in December 1986. Evidence of the cause of the defects, a material issue of fact, is in conflict. Holsing testified that it was after Lange left the construction site that water first began entering the leg pit, that the temperature cables broke, that the side draws malfunctioned, and that the bins ruptured. Even if Hallam did "accept" Lange's performance when it started elevating grain in September 1986 or when it continued using the facility after Lange left the site, Hallam is not precluded from claiming insubstantial performance as to these latent defects. See *Smith v. Erftmier*, 210 Neb. 486, 315 N.W.2d 445

(1982).

Moreover, Hallam's continued use of the facility after it became aware of the above-cited problems does not preclude Hallam from asserting insubstantial performance of the construction contract because of Hallam's duty to mitigate its damages. When there has been a breach of a contract by one party resulting in a loss to the other, it is the duty of such other party to take all reasonable steps to reduce the amount of his damages. *Erftmier, supra.* Holsing testified that prior to negotiating for construction of the bins, Hallam contracted to store about 640,000 bushels of milo for local farmers in anticipation of the increased storage space the facility would provide.

### (b) Substantial Performance

Because Hallam's first three assignments of error regard the trial court's rulings on Lange's foreclosure petition, these issues will be reviewed de novo, provided, where credible evidence is in conflict on a material issue of fact, we will consider and give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

A contractor cannot assert a mechanic's lien upon property where there has been only part performance or lack of substantial performance of the contract. *Reeves v. Watkins,* 208 Neb. 804, 305 N.W.2d 815 (1981). And as both parties acknowledge, Lange has the burden of establishing that it substantially performed.

Hallam first assigns as error that the trial court failed to properly allocate to Lange the burden of proving that Lange substantially performed the contract involved here. Hallam points out that the trial court did not discuss specifically the grain facility's various defects or their causes in relation to its finding of substantial performance. Instead, the trial court stated generally that Lange had "substantially completed the contract and that any defects attributable to the acts of Lange or the uncompleted work [were] of minor consequence when compared to the total project." In the absence of a specific request by a party, a trial court is not required to make detailed

findings of fact. See Neb. Rev. Stat. § 25-1127 (Reissue 1989). Hallam did not direct our attention to any request by Hallam for such findings. The trial court, however, did address individual defects as they related to Hallam's counterclaims and alternative requests for setoffs. The trial court's decision to organize its order in this way does not establish that it failed to properly allocate to Lange the burden of proving substantial performance.

After viewing all the evidence presented by Lange as part of its foreclosure action and by Hallam as part of its counterclaims, the trial court determined that Lange had met its burden of showing substantial performance. The trial court was not required to discuss its consideration of each aspect of Lange's performance but could state generally that, viewing the project as a whole, Lange had substantially performed.

In a building contract, substantial performance is shown when all the essential elements necessary for the full accomplishment of the purposes of the contract have been performed with such an approximation to complete performance that the owner obtains substantially what is called for by the contract. *Eliker v. Chief Indus.*, 243 Neb. 275, 498 N.W.2d 564 (1993); *Pioneer Enterprises v. Edens*, 216 Neb. 672, 345 N.W.2d 16 (1984); *Lange Bldg. & Farm Supply v. Open Circle "R"*, 216 Neb. 1, 342 N.W.2d 360 (1983). Thus, to establish substantial performance, any deviations from the contract must be relatively minor and unimportant.

The relevant terms of the contract between Hallam and Lange consist of those items outlined in the facts above. In building and construction contracts, in the absence of an express agreement to the contrary, the law implies that the building will be erected in a reasonably good and workmanlike manner and will be reasonably fit for the intended purpose. *Henggeler v. Jindra*, 191 Neb. 317, 214 N.W.2d 925 (1974).

With these rules in mind, we review whether Lange performed in a workmanlike manner, so that Hallam received an approximation of what the agreement required. We have examined seven of Hallam's main alleged defects in the facility: (1) late completion, (2) inadequate site elevation, (3) failure to wire aeration fan motors, (4) broken heat sensor cables, (5)

malfunctioning side draws, (6) two ruptured bins, and (7) the facility's failure to move grain at 7,000 b.p.h. There is sufficient evidence that Lange substantially performed its construction agreement with Hallam in a workmanlike manner.

The evidence fails to show that Lange breached any requirements as to the date of completion, elevation of the site, or wiring of the aeration fan motors. The agreement between William Lange and Holsing that the bins would be ready to receive grain by the fall of 1986 was vague at best. No specific date was mentioned. In any event, all the bins were in fact in use by mid-October.

The evidence is in conflict as to whether Lange breached any elevation requirement. William Lange's and Holsing's testimony is in conflict as to whether the floors of the bins or all of the construction was to be 12 inches above the railroad tracks. Lange constructed the floors of the bins and most of the other aspects of the facility above the 12-inch mark. The evidence is unclear whether Lange's placement of the unload augers below that level caused a drainage problem. There is evidence that some of the drainage problems may have been caused, at least in part, by subsequent grading of the site done by Hallam. We agree with the trial court that there is a lack of credible evidence with respect to issues relating to drainage or the proper height or elevation of any portion of the facility.

The agreement between Lange and Hallam specified no particular time when the aeration fan motors had to be connected. Hallam began using the facility before Lange had completed its construction. Hallam concedes that Lange had the aeration fans connected at least by the time it left the Hallam site in December. Lange's failure to connect the fans at some earlier time does not itself establish a breach of its performance under the agreement.

The evidence reflects that Lange installed heat sensor cables and side draws as prefabricated units according to manufacturers' instructions. The evidence reflects that the heat sensor cables failed either because of a design defect or improper installation. The evidence also reflects that the side draw pulleys did not fail because of Lange's installation, but failed because of a design defect.

With regard to its construction of the two ruptured bins, Lange produced evidence from an expert witness that the cause of the bins' failure was a defect in the manufacturer's design, not Lange's construction of the bins. Although Hallam's expert witness offered testimony that Lange's installation of the bolts contributed to the bins' rupture, he also testified that the ruptures were due, at least in part, to a design defect.

As to the facility's capacity, Lange produced evidence that it constructed the facility in accordance with the manufacturers' instruction manuals and in accordance with the terms of the agreement between Lange and Hallam. Lange delivered equipment designed to move 7,000 b.p.h. and constructed the facility intending that it move 7,000 b.p.h. Factors other than Lange's workmanship, such as Hallam's moving the grain before its grain cleaner became operational, may well have been the cause of the facility's failure to move 7,000 b.p.h.

Given the conflicting evidence on material issues of fact in this case, we are compelled to consider and give weight to the fact that the trial judge heard and observed the witnesses and accepted Lange's version of the facts rather than the version of the facts supplied by Hallam. We agree with the trial court's finding that Lange substantially performed its obligations under the Lange-Hallam agreement in a workmanlike manner.

### (c) Hallam's Liabilities

Hallam also claims that the trial court erred in finding Hallam liable for the removal of concrete from the construction site and for the repair of a conveyor belt. The trial court found that Hallam owed Lange for performing these services because they were not included in the parties' agreement.

William Lange testified that after concrete foundations were discovered under the site, Holsing agreed to pay for removing the concrete and backfilling the site. Holsing denied agreeing to pay for the cost of removing the concrete obstructions. Holsing argues that Hallam is not responsible for the site preparation because the agreement's preprinted provisions, which stated "Concrete, Electrical Wiring, Gas Hook-up, Fill Sand and Level Site to be furnished by the Buyer," had been stricken by interlineation and initialed by both parties on each purchase

order. However, the agreement also included a typewritten insertion located above the stricken clause, which required Hallam to provide a "clean level site."

The agreement does not appear to be ambiguous. The printed provision was stricken. The typewritten terms control. "When an instrument consists partly of written [or typewritten] and partly of printed form, the former controls the latter, where the two are inconsistent." Neb. Rev. Stat. § 25-1216 (Reissue 1989). Accord *Niedbalski v. Board of Ed. of Sch. Dist. No. 24*, 227 Neb. 516, 418 N.W.2d 565 (1988). For purposes of § 25-1216, typewriting is writing. *Mack Investment Co. v. Dominy*, 140 Neb. 709, 1 N.W.2d 295 (1941). Therefore, Hallam was properly held liable for $2,205 in site preparation costs.

With regard to replacement of the broken conveyor belt, William Lange testified that sometime before his company left the Hallam site, one of Hallam's employees "failed to turn on a top conveyor when the spout was running into it and it burnt the elevator conveyor belt in two." William Lange testified that his company repaired the belt at Holsing's request. Holsing testified that he did not remember that the belt broke because of a conveyor not being turned on. He stated that he did not pay the bill from Lange for repairing the conveyor belt because the leg was defective and he considered the bill "a little bit high." Given that credible evidence is in conflict on this assigned error, we again give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

We hold that the trial court did not err in finding that Hallam owed Lange $1,407.92 for the replacement of the broken conveyor belt.

2. APPEALS ARISING FROM COUNTERCLAIM

(a) Admission of Evidence and Allowance of Setoffs

Hallam claims that the trial court erred in failing to admit evidence relating to damages on its counterclaim and in failing to properly award setoffs against Lange.

Hallam's brief refers to evidence related to work that Wall Construction Company (Wall) performed on unload augers.

Wall drafted a proposal for Hallam which consisted of a $13,400 bid to perform 12 repair projects at the grain facility. Wall generated no invoices for the work outlined in the proposal, but Dale Wall, the company's president, testified that his business records reflected that Wall performed various work projects at the facility. Dale Wall could not specifically itemize the work recorded in his business records so that it corresponded with the work listed in the proposal. For some items listed in the proposal, Dale Wall had no records reflecting whether the proposed work was done. The trial court admitted into evidence the proposal from Wall, but stated with regard to Hallam's claim for damages to the unload augers, "There is absolutely a total lack of showing and lack of evidence to indicate . . . that the work was done or if it was done to differentiate between the charges made and whether they were necessary and any facts that gave rise to it."

Hallam later made an offer of proof that its expert witness, Henry Hollman, if permitted, would testify that $4,400 was a fair and reasonable cost of making the repairs that Wall testified his company made to the unload augers. However, the court ruled that Hollman's testimony would be irrelevant on the issue of proving Hallam's actual damages.

Without objection, Hollman testified that the repairs Wall made were temporary and that Hollman had been hired to permanently repair the unload augers. Over objection, Hollman testified that the fair and reasonable cost of making the permanent repairs would be $13,871.52. Also admitted into evidence was a bill from an electrician who wired the augers after Wall made its temporary modifications. The trial court did not award Hallam damages for any of these repairs.

Hallam's claim that the trial court erred in refusing to admit or consider evidence related to the repair of the unload augers is without merit. Damages are recoverable for losses caused by breach of contract only to the extent that the evidence affords a sufficient basis of ascertaining their amount in money with reasonable certainty. *LeRoy Weyant & Sons, Inc. v. Harvey and Classic Lanes*, 212 Neb. 65, 321 N.W.2d 429 (1982). It is a basic concept that in any damage action for breach of contract, the claimant must prove that the breach of contract complained of

was the proximate cause of the alleged damages. There must be a causal relationship between the damages asserted and the breach relied upon. Proof which leaves this issue in the realm of speculation and conjecture is insufficient to support a judgment. *Omaha P. P. Dist. v. Darin & Armstrong, Inc.*, 205 Neb. 484, 288 N.W.2d 467 (1980); *Olson v. Pedersen*, 194 Neb. 159, 231 N.W.2d 310 (1975).

In its order, the trial court found that although it was inclined to believe that the placement of the unload augers probably was defective, Hallam failed to produce credible evidence of the reasonable cost and necessity for repairs. The trial court stated, "[O]ne might find that some modification was necessary but the persons making the actual repairs or modifications should be available in order for this court to determine whether the work done was all necessary to cure the particular defect and was reasonable in amount." Without such credible evidence, the trial court declined to speculate as to the amount of damages. Hollman did not perform any work on the unload augers, and Wall could not itemize the costs for the work it did perform. Similarly, Hallam did not establish that the permanent repairs by Hollman or the electrical wiring were necessary or due to any defects caused by Lange's workmanship. The trial court was not clearly wrong in refusing to speculate as to (1) what repair work Wall did, (2) whether temporary or permanent repairs were related to improper construction by Lange, (3) the reasonable cost of any repairs, or (4) the necessity of any repairs.

Hallam also claims that the trial court erred in not awarding setoffs or damages for the costs Hallam incurred in repairing the two ruptured bins, the augers damaged because of the broken temperature cables, and the malfunctioning side draws. The trial court denied these damages because Hallam failed to produce evidence that Lange's construction or installation caused these failures. The trial court's finding of insufficient evidence to prove that Lange caused these damages was not clearly erroneous.

(b) Manufacturer's Warranty

Hallam next claims that the trial court erred in "considering

Lange's 'manufacturer's warranty' defense and evidence of a design defect in the failed bins." The trial court correctly noted in its order that except for Hallam's second cause of action in its counterclaim, no issues related to warranties of any kind were raised in this case. Hallam's second cause of action claimed that Lange had given Hallam a "warranty" that the facility would move 7,000 b.p.h. and that Lange had breached that warranty. Hallam's second cause of action had nothing to do with a warranty extended by Lange from the manufacturer on the bins that ruptured.

Nowhere in the pleadings did Lange raise a "manufacturer's warranty" defense. Moreover, Lange presented at trial an expert witness who testified that the two bins ruptured because of defects in their design. Hallam's assignment of error misstates what Lange argued and what the trial court actually considered regarding the cause of the bins' rupturing. In defending against Hallam's counterclaim that Lange constructed the two bins improperly, it was appropriate for Lange to present and for the trial court to consider evidence that something other than Lange's workmanship caused the bins to rupture.

### (c) Damaged Grain Allowance

Finally, Hallam claims that the trial court erred in failing to award Hallam damages for grain damage allegedly caused by Lange's negligence in not connecting the aeration fan motors to an electrical supply. The elements of a negligence action are duty, breach, proximate cause, and damages. *Grote v. Meyers Land & Cattle Co.*, 240 Neb. 959, 485 N.W.2d 748 (1992).

Hallam argues that once Lange knew Hallam had stored grain in the bins, Lange had a duty to promptly hook up the fan motors. Hallam claims that Lange breached this duty by failing to have its own electrician promptly connect the fan motors and by preventing the electrician Hallam hired from connecting the fan motors.

Even if we assume that Lange breached this duty, Hallam produced insufficient evidence to prove either causation or damages. The trial court found that Hallam did not produce credible evidence of the quality of the grain prior to its damage.

Without such evidence, Hallam could not establish the proximate cause of Hallam's grain spoilage or how much damage, if any, was attributable to the absence of the fans.

Holsing testified that bin No. 1 contained grade 1 or 2 milo, and bin No. 2 contained mostly grade 1 or 2 milo. Grade 1 means that the grain contains 13 percent moisture and 4 percent foreign material. Grade 2 means the grain contains 14 percent moisture and 8 percent foreign material.

The trial court concluded:

> The testimony and other evidence with respect to the allegedly spoiled grain is so disjointed and confusing as to be almost incomprehensible. In addition, the testimony of Mr. Holsing with respect to the grades of milo and its moisture content is not supported by his own records; these show moisture content above fourteen percent and the presence of bugs in a sizeable portion of this grain.

Lange produced evidence that the grain was of poor quality when it was loaded into the bins and that any spoilage of the grain could have been due to factors other than the absence of the aeration fans. Gerald Bodman, a University of Nebraska professor, testified that more than 50 percent of the grain was of poor quality due to bugs or moisture content greater than 14 percent and that the grain damage could not have been prevented even if the fans had been operational from the time the bins were filled.

Hallam failed to prove the amount of its alleged losses with any degree of certainty. Holsing claimed that the difference in market value of the grain in bins Nos. 1 and 2 was $76,800. Holsing also testified that he had blended the damaged grain with higher quality grain, but he failed to produce evidence of how much grain was sold at a reduced price because of any damage caused by heat. Therefore, the trial court determined that Hallam may not have suffered any actual monetary loss.

Given the lack of evidence as to the cause or amount of damaged grain, the trial court was not clearly wrong in refusing to award Hallam damages for spoiled grain in bins Nos. 1 and 2.

### 3. LANGE'S CROSS-APPEAL

#### (a) Prejudgment Interest

The district court denied Lange prejudgment interest on amounts due under the construction contract because "there was a reasonable controversy with respect to the amount the plaintiff was entitled to recover." Lange argues that the interest should be granted because the amount due could be computed with exactness. In its answer to Lange's cross-appeal, Hallam argues that the district court did not err in denying the interest because (1) the case was one in equity, not law; (2) a sufficient dispute existed as to the amount due; and (3) Lange did not properly claim prejudgment interest as required under Neb. Rev. Stat. § 45-103.02 (Reissue 1988). In its reply brief to Hallam's answer brief, Lange again argued that the claim was liquidated and also argued that it would be unconstitutional to apply § 45-103.02 to Lange's claim.

Prejudgment interest is recoverable upon the foreclosure of a mechanic's lien. *O'Keefe Elevator v. Second Ave. Properties*, 216 Neb. 170, 343 N.W.2d 54 (1984). See, also, *Walker v. Collins Construction Co.*, 121 Neb. 157, 236 N.W. 334 (1931). However, such interest is recoverable only when the claim is liquidated, that is, when there is no reasonable controversy as to either plaintiff's right to recover or the amount of such recovery. *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985); *O'Keefe Elevator, supra.* A two-pronged inquiry is required. There must be no dispute either as to the amount due or as to the plaintiff's right to recover, or both. *Atokad Ag. & Racing v. Governors of Knts. of Ak-Sar-Ben*, 237 Neb. 317, 466 N.W.2d 73 (1991), *overruled on other grounds, Eccleston v. Chait*, 241 Neb. 961, 492 N.W.2d 860 (1992).

The primary issue throughout this case has been whether Lange substantially performed so that it could foreclose its construction lien and recover the balance due. Thus, a reasonable controversy exists as to Lange's right to recover. Even if Lange had an undisputed right to recover, a reasonable controversy exists as to the amount owed. The amount of a claim is liquidated only when the evidence furnishes a basis to compute an exact amount determinable without opinion or

discretion inherent in the factfinding process. *Pugh v. Great Plains Ins. Co.*, 239 Neb. 171, 474 N.W.2d 677 (1991). The numerous disputes between the parties as to Lange's performance required the trial court to calculate the amount due Lange only after exercising its opinion and discretion in the factfinding process. See, *Gottsch Feeding Corp. v. Red Cloud Cattle Co.*, 229 Neb. 746, 429 N.W.2d 328 (1988); *Langel Chevrolet-Cadillac v. Midwest Bridge*, 213 Neb. 283, 329 N.W.2d 97 (1983).

The trial court did not err in finding that Lange's claim was unliquidated and in refusing to award Lange prejudgment interest.

Because Lange's claim is unliquidated, we need not address the applicability or the constitutionality of § 45-103.02. Moreover, the constitutionality of the statute was never raised at the district court level. An appellate court will not consider a constitutional question unless it has been properly presented to the trial court for disposition. *State ex rel. Sileven v. Spire*, 243 Neb. 451, 500 N.W.2d 179 (1993).

### (b) Counterclaim Award for Dump Pit

Lange's second assignment of error on cross-appeal is that the trial court erred in awarding Hallam $1,464.30 on its counterclaim for modifications to the dump pit. Lange did not include any discussion or arguments of this assigned error in its briefs. To be considered by an appellate court, an error must be assigned and discussed in the brief of the one claiming that prejudicial error has occurred. *Maack v. School Dist. of Lincoln*, 241 Neb. 847, 491 N.W.2d 341 (1992). Therefore, we will not consider Lange's second assignment of error, and the trial court's award of $1,464.30 to Hallam for repairs to the dump pit should be affirmed.

### V. CONCLUSION

Both parties' assigned errors are without merit. The judgment of the trial court was correct in all respects and is affirmed.

AFFIRMED.

CAPORALE, J., not participating.