MIDLANDS RENTAL & MACHINERY, INC., A NEBRASKA CORPORATION, APPELLEE, V. CHRISTENSEN LIMITED PARTNERSHIP, A NEBRASKA LIMITED PARTNERSHIP, APPELLANT.

566 N.W.2d 115

Filed July 11, 1997. No. S-95-1128.

Thomas B. Thomsen, of Sidner, Svoboda, Schilke, Thomsen, Holtorf, Boggy & Nick, for appellant.

Raymond R. Aranza, P.C., and John M. Lingelbach, of Marks Clare & Richards, for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CONNOLLY, J.

Pursuant to separate agreements, Midlands Rental & Machinery, Inc., furnished to L & L Homes, Inc., two forklifts and a storage unit to be used in framing houses on property in a new subdivision. Upon L & L's failure to make payments on this equipment, Midlands filed a construction lien on the property, of which Christensen Limited Partnership is the title owner. The district court for Dodge County determined that Christensen was not a "protected party" for purposes of the Nebraska Construction Lien Act (Act) and that Midlands had a valid lien in the amount of $13,300. We agree that Midlands has a valid lien, but only in the amount of $5,690. We therefore affirm, as modified, the decision of the district court.

## FACTS

On March 15, 1994, Christensen entered into an agreement with Deerfield Homes, L.L.C., whereby Deerfield obtained the exclusive right to purchase from Christensen property lots within the Deerfield Subdivision (known as the Deerfield Meadows Subdivision) in Fremont, Nebraska. Pursuant to the agreement, Deerfield would then contract with potential homeowners to build homes on the lots. The agreement also provided that once construction was completed on a home, the real estate

would transfer from Christensen to Deerfield, with Deerfield then transferring the property to the homeowner.

In constructing houses in the Deerfield Meadows Subdivision, Deerfield would utilize various subcontractors. One such subcontractor was L & L, whose job it was to frame the houses. To assist in this endeavor, L & L entered into an agreement with Midlands to obtain two forklifts and a storage container for tools and material.

L & L initially entered into a rental purchase agreement with Midlands for one forklift on June 24, 1994. The second forklift and storage container were leased to L & L in subsequent lease agreements. L & L made no payments on either forklift or the storage container, and all were subsequently taken back by Midlands. On October 4, Midlands filed a construction lien against Christensen, as owner of the lots on which L & L used the equipment, in the amount of $17,499.43. After substituting collateral pursuant to Neb. Rev. Stat. § 52-142 (Reissue 1993), Christensen challenged the lien, contending its ownership in the lots in question was not subject to Midlands' lien.

Mark Ferraina, general managing partner of Christensen and president of Deerfield, testified that he witnessed L & L using the forklifts and storage container at various lots within the Deerfield Meadows Subdivision during June, July, and August 1994. According to Ferraina, Midlands did not give Deerfield or Christensen notice of a potential lien, and at the time he was actually made aware of the lien, Deerfield had already paid L & L in full for its framing work.

Donald Partridge, sales manager for Midlands for the past 11 years, stated that David Leander of L & L contacted him in the spring of 1994 concerning the purchase of a forklift to assist in framing homes in the Deerfield Meadows Subdivision. L & L contacted Midlands again a short time later to rent the other forklift and the storage container. No payments were ever made to Midlands. Partridge testified that after L & L failed to make payments on the purchase of the first forklift, the agreement was converted into a rental agreement; however, there is no document in evidence that replaced the rental purchase agreement for that forklift. For purposes of determining the appropriate lien amount, Partridge prepared exhibit 7, which is a summary

of the rentals showing the starting and ending dates of each rental period and the reasonable rental fee charged for the time the equipment was at the jobsite. This summary concluded that the total amount due Midlands for the rental of both forklifts and the storage container was $13,300.

Partridge also testified that he stopped by Deerfield's construction office to discuss L & L's failure to pay its rental debts on several occasions but that no one was present at the office. Ultimately, Midlands sent a notice of lien liability to Ferraina on October 6, 1994, 2 days after the lien was filed.

The district court concluded that Christensen does not qualify as a protected party and that Midlands therefore has a valid construction lien pursuant to the Act in the amount of $13,300. Christensen appeals.

## ASSIGNMENTS OF ERROR

Summarized and restated, Christensen's assignments of error contend the district court erred in (1) granting judgment in favor of Midlands, because the decision is contrary to law and not supported by sufficient evidence; (2) permitting Partridge to testify as to the reasonable rental value of the two forklifts and storage container; and (3) receiving exhibit 7 into evidence.

## STANDARD OF REVIEW

An action to foreclose a construction lien is one grounded in equity. In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Landmark Enterprises v. M.I. Harrisburg Assocs.*, 250 Neb. 882, 554 N.W.2d 119 (1996); *Blue Tee Corp. v. CDI Contractors, Inc.*, 247 Neb. 397, 529 N.W.2d 16 (1995).

## ANALYSIS

We begin our analysis by noting that this appeal requires us to determine whether Midlands has a valid construction lien enforceable against Christensen. The answer to this inquiry lies

within the Act. In that connection, we reiterate that "[t]he object of the mechanic's lien being to secure the claims of those who have contributed to the erection of a building, it should receive the most liberal construction to give full effect to its provisions." *Blue Tee Corp. v. CDI Contractors, Inc.*, 247 Neb. at 402, 529 N.W.2d at 20.

The Act allows the supplier of a subcontractor to file a construction lien. See Neb. Rev. Stat. § 52-126 (Reissue 1993). In particular, the Act allows a lien to be filed for tools, appliances, or machinery used in the construction process. Neb. Rev. Stat. § 52-134(1)(b)(iv) (Reissue 1993). The amount of a lien arising from the supplying of tools, appliances, or machinery is limited as follows:

(a) If they are rented, the lien is for the reasonable rental value for the period of actual use and any reasonable periods of nonuse taken into account in the rental contract; and

(b) If they are purchased, the lien is for the price but arises only if they were purchased for use in the course of the particular improvement and have no substantial value to the purchaser after the completion of the improvement on which they were used.

§ 52-134(3).

Christensen asserts that L & L purchased the first forklift, as evidenced by both the rental purchase agreement and Midlands' filing of a financing statement on it. Christensen therefore asserts that, pursuant to § 52-134(3)(b), a lien can be filed as to that forklift only if it had no substantial value when it was taken back by Midlands. Since the testimony offered at trial established that the forklift did have substantial value when returned to Midlands, Christensen claims there can be no lien for that particular forklift. Midlands disagrees, contending that because L & L made no payments pursuant to the rental purchase agreement, the purchase of the forklift was not consummated. In making this assertion, Midlands relies on Partridge's testimony that the rental purchase agreement for the first forklift was changed to a straight rental agreement after L & L failed to make payments. It is therefore argued that the first forklift was only rented to L & L and that Midlands can obtain a lien for its reasonable rental value.

Partridge testified at trial that Leander contacted him concerning his desire to purchase a forklift on behalf of L & L. After Partridge checked credit references, Midlands entered into the rental purchase agreement with L & L. This agreement is contained in the record as exhibit 9 and provides the "monthly rental per unit" price to be $5,000 and the "delivered price per unit" to be $79,000. According to Partridge, these amounts were based upon L & L's purchasing the forklift. Consistent with the testimony establishing that L & L intended to purchase the forklift is Midlands' act of obtaining a financing statement from L & L for the forklift and filing it with the Nebraska Secretary of State. Based upon this evidence we conclude, in our de novo review, that both Midlands and L & L thought the forklift was being purchased by L & L and that the rental purchase agreement did not turn into a straight rental agreement as Midlands now asserts. That being the case, there can be no lien for the amount owed on the first forklift because when it was returned to Midlands it still had substantial value. See § 52-134(3)(b).

The parties are in agreement, however, that the remaining forklift and the storage unit were leased to L & L. Determination of the proper lien amount for these pieces of equipment is therefore dependent upon the reasonable rental value for both. Testimony as to the rental value of the forklifts and the storage unit was given by Partridge. Partridge's computations were compiled into exhibit 7, which was received over Christensen's objection. The figures summarized in exhibit 7 show a rental cost of $7,700 for the first forklift, $5,200 for the second forklift, and $490 for the storage unit. As an aside, we note that although the total of these figures is $13,390, exhibit 7 sets the total at $13,300, presumably because the $90 delivery fee for the storage unit was inadvertently overlooked. Regardless, Partridge testified that in arriving at these rental figures he took into consideration a number of factors, including the cost of acquisition of the forklifts, the estimated utilization, and the cost to maintain the forklifts.

Christensen asserts the court erred in relying on these figures to arrive at the lien amount, because the "reasonable rental value," as used in § 52-134(3)(a), means the value that such

equipment provides to the real estate improvement and does not depend upon the agreement, between the parties as to rental value. In making this argument, Christensen notes that Rod Nielsen, a building contractor, testified at trial that the normal practice of framers is to rent a crane instead of a forklift to assist in placing beams. Nielsen further testified that renting a crane costs between $50 and $150. Christensen therefore contends that any lien allowed should be limited to this amount.

We first note that the reasonable rental value for the first forklift, as set forth in exhibit 7 or otherwise, is irrelevant in accordance with our above analysis that the forklift was actually purchased. Concerning the remaining forklift and the storage unit, we do not agree with Christensen's assertion that a lien for amounts owed on this equipment is determined solely by the value the real estate is actually improved. Section 52-134(3)(a) specifically states that the lien amount for the supply of equipment is "for the reasonable rental value for the period of actual use and any reasonable periods of nonuse taken into account in the rental contract." The intent of this section is clear: the reasonable rental value of the equipment is to be used in determining the appropriate lien amount for leased equipment. Thus, despite Nielsen's testimony that a different machine could accomplish the same results as a forklift at a cheaper rate, the fact remains that L & L entered into agreements with Midlands to rent the forklift and the storage unit to assist in framing houses. Thus, § 52-134(3)(a) requires that the reasonable rental value of that equipment be determined in setting the amount of a lien, regardless of the monetary amount by which the value of the real estate is actually increased by the use of the rented equipment.

In computing the reasonable rental value of the equipment rented to L & L, Partridge, an individual with 11 years' experience in renting construction equipment, stated that he took into account the cost of acquiring the equipment as well as the estimated utilization of it. Partridge's conclusions were set forth in exhibit 7. The second forklift was leased to L & L from August 1 to September 25, 1994, a period of 8 weeks or 2 months. According to Partridge, the reasonable rental value of the forklift was $2,500 per month. As such, the reasonable rental value

for the second forklift was found to be $5,000. Partridge added $200 to this amount for a delivery charge, for a total rental value of $5,200. From our de novo review of the evidence, we cannot conclude that this figure is incorrect. Indeed, the rental agreement Midlands entered into with L & L established that the rental price for the forklift was $750 per week. Multiplying the 8-week rental period by this amount equals $6,000, actually more than the amount set forth by Partridge at trial and in exhibit 7.

The rental period for the storage unit was 4 months, from June 6 to September 25, 1994. In arriving at the reasonable rental value for this unit, Partridge concluded that a rental value of $100 per month was appropriate. In fact, the rental agreement between Midlands and L & L for the storage unit was for this amount. As such, Partridge concluded, in exhibit 7, that the reasonable rental value of the storage unit delivered to L & L was $400 plus a $90 delivery charge, for a total rental value of $490. Once again, from our de novo review of the record, we conclude that this rental figure is correct.

We therefore conclude that while the trial court erred in finding that L & L leased the first forklift, it did not err in admitting and relying on exhibit 7 in determining the reasonable rental value of the second forklift and the storage unit. Thus, the amount of the lien should have been set at $5,690.

As an additional argument, Christensen points out that special protection is given under the Act to a "protected party contracting owner." A contracting owner is "a person who owns real estate and who, personally or through an agent, enters into a contract, express or implied, for the improvement of the real estate." Neb. Rev. Stat. § 52-127(3) (Reissue 1993). A protected party is either:

(a) An individual who contracts to give a real estate security interest in, or to buy or to have improved, residential real estate all or a part of which he or she occupies or intends to occupy as a residence;

(b) A person obligated primarily or secondarily on a contract to buy or have improved residential real estate or on an obligation secured by residential real estate if, at the time he or she becomes obligated, he or she is related to an

individual who occupies or intends to occupy all or a part of the real estate as a residence[.]

Neb. Rev. Stat. § 52-129(1) (Reissue 1993). According to Neb. Rev. Stat. § 52-136(2) (Reissue 1993), a claimant's lien, as against a "protected party contracting owner," is the lesser of "(a) [t]he amount unpaid under the claimant's contract; or (b) [t]he amount unpaid under the prime contract through which the claimant claims at the time the contracting owner receives the claimant's notice of lien liability."

Christensen argues that the houses L & L worked on are subject to purchase agreements with third-party buyers who intend to occupy the houses as residences. As such, Christensen contends that those purchasers constitute "protected party contracting owners," thereby invoking § 52-136(2) to determine the amount of the lien. The evidence adduced at trial establishes that no notice of lien liability was given until the lien was actually filed on October 4, 1994, which was after Deerfield had paid L & L in full. Thus, Christensen asserts that the lien should be disallowed because § 52-136(2)(b) limits the amount of a lien to the amount the prime contractor owes the subcontractor when notice of the lien is received, which, in this case, is nothing.

In light of the fact that the Midlands lien was filed on property owned by Christensen, we find its argument that the purchasers of the houses are protected parties peculiar. The parties stipulated at trial that Christensen was the record titleholder of the properties on which the lien was filed. There can be little doubt, therefore, that Christensen is a contracting owner, especially in light of our statement: "The word 'owner' as used in our mechanic's lien law is not limited in its meaning to an owner of the fee, but means the owner of any interest in the lands and includes every character of title, whether legal or equitable, fee simple, or leasehold." *May Plumbing Co. v. Shaver*, 182 Neb. 251, 256, 153 N.W.2d 911, 915 (1967).

Moreover, despite the fact that the properties and houses are subject to purchase agreements, the interest in the real estate a vendor retains is subject to a construction lien. See *Bohn Mfg. Co. v. Kountze*, 30 Neb. 719, 46 N.W. 1123 (1890).

The determinative issue for Christensen's argument therefore becomes whether it is a "protected party" contracting owner. As

noted, one must intend to occupy the real estate as a residence to be considered a "protected party." See § 52-129(1)(a) and (b). Obviously, neither Deerfield nor Christensen intended to occupy the newly built houses. This fact was made clear during the trial by testimony from Ferraina. Because Christensen is not a protected party for purposes of the Act, its assertion that the amount of the lien should be determined by § 52-136 is without merit.

Finally, we address Christensen's contention that Midlands breached its duty to provide notice of lien. Christensen attempts to support this contention with Neb. Rev. Stat. § 52-135(1) (Reissue 1993), which states, in part, that "[a]t any time after a claimant has entered into the contract under which he or she may claim a lien . . . he or she *may* give a notice of lien liability to the contracting owner." (Emphasis supplied.) Christensen's reliance on this statute is incorrect for two reasons. First, § 52-135(1) applies only to protected party contracting owners. See § 52-135(5). As noted above, Christensen is not a protected party. Second, as the plain words of this statute make clear, a party that may eventually claim a lien may, if it so desires, give notice of lien liability to the contracting owner. Christensen's belief that this statute *requires* that such notice be given is simply inconsistent with the statute's plain wording. Thus, Christensen's assertion that Midlands was required to give notice of lien liability prior to its filing of the lien is without merit.

## CONCLUSION

In accordance with the above analysis, we affirm the district court's determination that Midlands has a valid construction lien under the Act and that it may enforce the lien against Christensen, the owner of the property improved. However, we conclude that the district court erred in considering the amount owed on the first forklift in determining the amount of the lien. As noted above, the evidence establishes that the lien should have been granted in the amount of $5,690.

AFFIRMED AS MODIFIED.