TILT-UP CONCRETE, INC., A NEBRASKA CORPORATION, APPELLEE,
v. STAR CITY/FEDERAL, INC., A SOUTH DAKOTA CORPORATION,
APPELLANT.
582 N.W. 2d 604

Filed July 31, 1998.    No. S-96-508.

Robert T. Grimit, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellant.

Edward H. Tricker and Kerry L. Kester, of Woods & Aitken, for appellee.

CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

GERRARD, J.

Tilt-Up Concrete, Inc. (Tilt-Up), constructed improvements on real estate owned by Star City/Federal, Inc. (Star City). Upon Star City's failure to make payments for the improvements, Tilt-Up filed a construction lien on the real estate and, subsequently, filed a petition for foreclosure in the district court. The district court found that Tilt-Up had a valid construction lien in the amount of $852,243.70 and entered judgment against Star City in that amount plus prejudgment interest and costs. Star City appeals. Because we determine in our de novo review that the district court erred in calculating the value of Tilt-Up's construction lien at full contract damages, rather than at the reasonable value of services performed and materials furnished, we find that Tilt-Up is entitled to recover from Star City the sum of $235,418 and modify the judgment of the district court accordingly.

## FACTUAL BACKGROUND

Tilt-Up is a contractor specializing in the construction of buildings using concrete wall panels that are cast on the building site and then "tilted up." Steve Miers is the president of Tilt-Up. Tilt-up walls differ from precast walls in that the wall panels are formed and poured on casting slabs at the building site rather than at the factory.

Star City is the owner of the real estate upon which Tilt-Up constructed improvements pursuant to the authorization of H. Lee Gendler, now deceased. Gendler was a shareholder and the president of Star City, the company he formed to provide a building for lease to the U.S. General Services Administration

(GSA) to house the Lincoln, Nebraska, office of the Immigration and Naturalization Service (INS). The construction of the building was known as the INS Project. Gendler also was a shareholder and the president of Marathon Realty, Inc., and Olympic General, Inc. The INS project was the last of 5 construction projects performed by Tilt-Up for the Gendler companies during the 1989-93 time period and was 1 of over 50 projects for which Gendler obtained lump-sum price quotes from Tilt-Up for Tilt-Up's normal scope of work. James Nicas was an employee of the Gendler companies and provided information to Miers for use in furnishing such price quotes.

In the fall of 1992, Miers informed Gendler that the GSA intended to lease a building in the downtown Lincoln area. Thereafter, Gendler negotiated an option to purchase the real estate upon which the INS Project was constructed. In early 1993, Gendler obtained the GSA Solicitation for Offers (SFO) for the INS Project and began to assemble a proposal to construct a building to lease to the GSA.

During early 1993, Nicas and Gendler began formulating Star City's lease price proposal for the INS Project by determining construction and financing costs. In so doing, Nicas requested a price from Miers for the normal Tilt-Up scope of work, which included constructing the foundations and floor slabs, erecting structural steel supports and wall panels, and doing the caulking, grouting, and exterior finish work. Miers was provided with the SFO and the design information necessary to price Tilt-Up's scope of work.

On April 27, 1993, Tilt-Up submitted to Nicas its first lump-sum bid on the INS Project. Nicas testified that he absolutely expected and wanted a price from Tilt-Up such that if Star City were awarded the project, Nicas could require Miers to perform the work for that amount. In order to facilitate the pricing of Tilt-Up projects, Nicas had developed a "Building Shell Estimating Form" (Form) upon which he delineated the specific work activities which Tilt-Up was to include in its bid price, and Nicas used it whenever Gendler was considering tilt-up-style construction for a project. Tilt-Up's April 27 bid was submitted on Nicas' Form and included within its scope the requisites listed under item 1, entitled "Tilt-Up Contract."

Tilt-Up's April 27, 1993, bid conveyed Tilt-Up's lump-sum price of $1,172,000.11 for the stated scope of work. The bid included the requisites listed under the "Tilt-Up Contract" portion, item 1 of Nicas' Form. It also included the underslab fill sand, two elevator pits, and structural engineering for the INS Project. It did not include any accommodations for winter conditions, since Star City was anticipating an award of the INS Project in the first week of September and planned to have the tilt-up building shell completely erected by mid-November.

On approximately June 8, 1993, Nicas provided Miers with the information necessary to revise Tilt-Up's price to add a loading dock. On June 15, Miers gave Nicas Tilt-Up's revised price of $1,308,000. Nicas and Gendler each understood the $1,308,000 price to include the work described under item 1 of Nicas' Form. Thereafter, Nicas and Gendler requested Miers to revise the price again to reflect an increase in the load-bearing capacity of the second floor of the building to 150 pounds. On June 29, Miers gave Nicas the revised Tilt-Up price of $1,352,800. Miers confirmed this price in writing on June 30. Nicas understood that the scope of work included in Tilt-Up's $1,352,800 lump-sum price was everything included in the $1,308,000 price, plus an adjustment for the increase in the load-bearing capacity of the second floor.

In approximately October 1993, Star City submitted its best and final offer for the INS Project to the GSA. On November 23, the GSA formally awarded the INS Project to Star City. Within a day of the award, Nicas advised Miers that Tilt-Up should plan on constructing the project through the winter months. To accommodate winter construction conditions, Gendler agreed to pay a portion of the cost of the special fabrication of insulating blankets. Gendler also asked Miers to have the site work done and to have 6 to 8 inches of rock backfill placed on the site to alleviate potential moisture problems. Such work was considered by both Miers and Gendler to be extra work that was not included in Tilt-Up's $1,352,800 price. Gendler later agreed to pay Tilt-Up's cost plus 10 percent for the site work and cost plus 5 percent for the rock backfill work.

On December 15, 1993, Miers hand delivered to Gendler a letter setting forth Miers' understanding of the changes that had

been made to the project since June and the extra work Gendler authorized and anticipated. In the letter, Miers confirmed and delineated the scope of his $1,352,800 price; proposed a unit price for the additional quantities of footings resulting from the changes in footing design ordered by Nel Hymans, Star City's project engineer; and set forth the terms upon which Tilt-Up would perform other work items or extras that had been authorized and which were not within the scope of Tilt-Up's $1,352,800 price. Upon receipt of Miers' December 15 letter, Gendler did not express any disagreement with the pricing of the original scope of work, the pricing of the extras, or the delineation of the original scope and the extra work.

The next day, December 16, 1993, Miers discussed the project with Gendler and asked whether Tilt-Up should delay commencement of the footing work, which was a part of Tilt-Up's normal scope of work, until after the December 18 groundbreaking ceremony. Gendler told Miers to get started and requested that Miers have on site for the groundbreaking some dirt-moving equipment for photographs. Miers was notified of the city of Lincoln's approval of the footing and floor plans on December 17 and began footing installation that same day. At the December 18 groundbreaking ceremony, Gendler informed the audience that Tilt-Up was the contractor for the building shell. In addition, Gendler inspected the progress of Tilt-Up's work and indicated his pleasure with the rapid progress being made on the footings.

Hymans directed the digging and placement of the footings and increased the amount of reinforcing steel used in the footings. By the end of the day on December 19, 1993, Tilt-Up had completed the digging, placed reinforcing steel, and poured approximately 2,119 cubic yards of concrete footings, all according to Hymans' directions. The next day, Tilt-Up began placement of the rock backfill, and Gendler directed Miers to build the forms and pour the concrete floor slab because the weather was still good.

Gendler's first written response to Tilt-Up's December 15, 1993, letter was a letter dated December 29. Gendler's letter did not tell Tilt-Up to cease working or inform Tilt-Up that there was no agreement. Rather, Gendler's letter asked that Tilt-Up

(1) share with Star City any savings Tilt-Up might have realized in buying out the material for the project, (2) lower the price for the base scope of Tilt-Up's work, and (3) provide a new price for the entire job. The letter also indicated Gendler's understanding of the scope of the work included in Tilt-Up's price of $1,352,800, his agreement with the pricing of certain of the extra work set forth in Tilt-Up's December 15 letter, and his disagreement with Tilt-Up's pricing of the extra footing work, which had already been performed.

Subsequent to the sending of his letter to Miers, Gendler was on the INS Project site. Tilt-Up had begun fabricating the window forms used in casting the concrete wall panels and was protecting the ground and concrete slabs with insulated blankets. At this time, Miers requested a progress payment from Gendler, and Gendler wrote a check to Tilt-Up for $10,000 in partial payment for the foundation work.

Miers responded to Gendler's December 29, 1993, letter in a letter dated January 10, 1994, by proposing to reduce Tilt-Up's base contract price by $40,800 in view of the progress made on the project and the fact that Gendler had been a good customer. Furthermore, Miers responded to some of Gendler's questions and expressed agreement on the pricing of certain of the extra work items. Gendler never accepted Tilt-Up's January 10 proposed amendments. Subsequently, Gendler instructed Ben Voegtli, his construction manager, to estimate the probable cost of Tilt-Up's normal scope of work in order to check Miers' prices. Voegtli did so in early January, using unit prices provided to him by Gendler. The estimate did not include the site work performed by Tilt-Up. Voegtli provided the estimate to Gendler in the amount of $1,364,026.

Gendler then requested Voegtli to revise his estimate of Tilt-Up's work and reduce the unit prices for certain items and to reduce the estimated overhead and profit margin by one-half. Voegtli did so, arriving at $1,310,821, and provided the results to Gendler. Another estimate of Tilt-Up's work was prepared by Voegtli and revised by Gendler, which further reduced the overhead and profit estimate and utilized unit prices determined by Gendler. The estimated prices for the various items of Tilt-Up's work were in many instances lower than those Voegtli would

have estimated based upon his experience in the industry. The result was an estimate dated January 14, 1994, in the amount of $1,261,991 for certain portions of Tilt-Up's scope of work.

Gendler also asked Voegtli to prepare an estimate of the cost of using precast concrete wall construction for the project to compare to Gendler's tilt-up estimate. Again, Gendler provided most of the unit prices and the profit margin information. The estimated precast cost was $1,411,994. Thereafter, Gendler revised the precast estimate to $1,219,850 without discussing any of the changes with Voegtli.

On January 14, 1994, Gendler and Miers met and discussed Gendler's estimates for Tilt-Up's scope of work and the extras. Miers told Gendler that Gendler's estimates were artificially low and, in fact, below Tilt-Up's historic costs for such work. At the conclusion of this meeting, Gendler did not tell Miers to stop work or to get off the job. Rather, Gendler told Miers that Gendler was not satisfied with Tilt-Up's price and left it at that. Later on that same day, after an exchange of letters regarding pricing of the extra work, Gendler sent a letter to Tilt-Up on behalf of Star City. In the letter, Gendler used his own tilt-up and precast estimates as a basis for requesting a lower price from Tilt-Up.

After receipt of Star City's proposal, Miers met with Gendler and provided information demonstrating that Gendler's proposed pricing was below Tilt-Up's historic costs for certain work items. By the end of this meeting, Miers believed he and Gendler had agreed on a payment of $175,814 to cover the progress made on the footings to date. Gendler told Miers he could pick up a check for $175,814 on January 17, 1994. Subsequently, there was disagreement over whether such amount covered only the footing progress to date, and when Miers arrived at Gendler's office on January 17 to pick up the check, Miers was told that Gendler had directed that no check be given to Tilt-Up. According to Gendler, a check was not issued to Tilt-Up because Miers did not submit an invoice for $175,814, which was a part of the agreement. Miers, however, testified that when he asked for the check, he was not asked to submit an invoice.

On January 17 and 18, 1994, Gendler discussed Tilt-Up's pricing with his brother, who was one of two other shareholders of Star City, and determined that they could get the work done for less money than Tilt-Up's price. On January 19, Miers called Gendler and again attempted to resolve the situation. Miers told Gendler that the contract amount with all of the anticipated and authorized extras and changed work totaled $1,633,605. Gendler responded that he would not pay more than $1,261,991 for such work, including all of the extras. Miers told Gendler that Tilt-Up was ready to continue its performance of the INS Project. In the absence of any payment forthcoming from Star City, Tilt-Up timely filed its construction lien on January 20. On the following day, Tilt-Up received a certified letter from Star City, dated January 20 and signed by Gendler, ordering Tilt-Up to terminate all construction activities immediately.

On April 7, 1994, Tilt-Up filed a petition in the district court, seeking foreclosure of its construction lien. Following a bench trial, the district court entered a judgment, finding that Tilt-Up had a valid construction lien in the amount of $852,243.70 and awarding Tilt-Up that amount, plus costs and prejudgment interest. The district court calculated the value of Tilt-Up's mechanic's lien at full contract damages:

| | |
|---|---|
| $1,628,182.00 | Contract price |
| - 622,841.00 | Cost savings realized |
| - 164,284.00 | Amount already paid |
| + 11,186.70 | Finance charges incurred |
| $ 852,243.70 | Total damages/lien amount |

Thereafter, Star City filed a notice of appeal, and we removed the matter to our docket pursuant to our power to regulate the caseloads of the Nebraska Court of Appeals and this court.

## SCOPE OF REVIEW

An action to foreclose a construction lien is one grounded in equity. In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact,

the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Midlands Rental & Mach. v. Christensen Ltd.*, 252 Neb. 806, 566 N.W.2d 115 (1997); *Landmark Enterprises v. M.I. Harrisburg Assocs.*, 250 Neb. 882, 554 N.W.2d 119 (1996).

## ASSIGNMENTS OF ERROR

Star City assigns 10 errors, which may be consolidated and restated into the following 5 errors: The trial court erred in finding that (1) Tilt-Up entered into a lump-sum contract with Star City, (2) Tilt-Up was a prime contractor, (3) the lack of substantial performance of the contract did not eliminate Tilt-Up's construction lien, (4) Tilt-Up had a construction lien for more than the reasonable value of services performed and materials supplied by awarding breach-of-contract damages, and (5) the construction lien award was supported by adequate evidence.

## ANALYSIS

### CONTRACT

"A person who furnishes services or materials pursuant to a real estate improvement contract has a construction lien . . . ." Neb. Rev. Stat. § 52-131(1) (Reissue 1993). A "real estate improvement contract" is defined as "an agreement to perform services, including labor, or to furnish materials for the purpose of producing a change in the physical condition of land or of a structure . . . ." Neb. Rev. Stat. § 52-130 (Reissue 1993). A construction lien is not valid absent a contract between the parties. *Mid-America Maintenance v. Bill Morris Ford*, 232 Neb. 920, 442 N.W.2d 869 (1989).

While conceding that the improvement of real estate was involved in the instant case, Star City asserts that there was insufficient evidence that a lump-sum contract existed between Tilt-Up and Star City. Tilt-Up, on the other hand, contends that Tilt-Up and Star City, by virtue of their respective words and actions or inactions, had a meeting of the minds sufficient to establish a lump-sum contract for Tilt-Up's normal scope of work, plus the extra and changed work authorized by Star City, all as set forth in Tilt-Up's December 15, 1993, letter. There-

fore, the first issue for this court's resolution is whether Tilt-Up and Star City entered into a lump-sum contract, plus the extra and changed work.

A contract may be written or oral and can be shown by circumstantial evidence. *Joseph Heiting & Sons v. Jacks Bean Co.*, 236 Neb. 765, 463 N.W.2d 817 (1990). To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Hoeft v. Five Points Bank*, 248 Neb. 772, 539 N.W.2d 637 (1995); *Cimino v. FirsTier Bank*, 247 Neb. 797, 530 N.W.2d 606 (1995). Mutual assent to a contract is determined by the objective manifestations of intent by the parties, not by their subjective statements of intent. See *Viking Broadcasting Corp. v. Snell Publishing Co.*, 243 Neb. 92, 497 N.W.2d 383 (1993).

With regard to the existence of an offer to enter into a lump-sum contract in the instant case, it is undisputed that Nicas, an agent for Star City, solicited from Tilt-Up a bid for the scope of work normally performed by Tilt-Up on projects for the Gendler companies for Star City's use in formulating a firm lease-price proposal. It is further undisputed that Tilt-Up tendered to Nicas a firm lump-sum price of $1,352,800 on June 29, 1993, to perform Tilt-Up's normal scope of work, which price was confirmed in writing on June 30. The evidence shows that Nicas expected a price from Tilt-Up such that if Star City were awarded the project, Nicas could require Miers to perform the work for that amount. Subsequent to the June 29 bid, as a result of design changes and Gendler's authorization to Tilt-Up to perform certain extra work, Miers confirmed to Gendler Tilt-Up's price of $1,352,800 and the associated scope of work in a letter dated December 15. Miers also provided Tilt-Up's prices for the additional items of changed and extra work that Gendler and Hymans had authorized. Therefore, undoubtedly, Tilt-Up, by virtue of its June 29 bid and December 15 letter, submitted an offer to Star City whereby Tilt-Up would perform its normal scope of work on the INS Project for the lump-sum price of $1,352,800, plus the extra and changed work as authorized and requested by Star City.

With regard to the existence of an acceptance of Tilt-Up's offer, the evidence demonstrates that Star City, by virtue of its words and actions or inactions, did manifest assent to Tilt-Up's bid price and the extra and changed work. Acceptance of an offer may be illustrated by words, conduct, or acquiescence indicating agreement and may be indicated by the silence and inaction of an offeree. *Joseph Heiting & Sons v. Jacks Bean Co., supra.* The record reveals that at no time between Tilt-Up's December 15, 1993, letter to Gendler and December 29 did Gendler ever tell Miers to stop work, tell him they had no deal, or express any dissatisfaction or disagreement with either the scope or the pricing of Tilt-Up's work. Rather, after receipt of Miers' December 15 letter, Gendler, on behalf of Star City, authorized and directed Tilt-Up to perform the footing work. Thus, in accordance with Gendler's authorization, Tilt-Up commenced work on the footings under the direction and supervision of Hymans.

In addition to Gendler's authorization to commence work, the record also shows that during a portion of the time of Tilt-Up's performance on the INS Project, Gendler was on site and personally observed the progress being made without voicing any objections and that Gendler subsequently made a $10,000 partial payment to Tilt-Up. Furthermore, at the December 18 groundbreaking ceremony, Gendler announced that Tilt-Up was the building-shell contractor for the INS Project. Clearly, Gendler's and Hyman's directions to Tilt-Up after receipt of Tilt-Up's December 15 letter, as well as Gendler's acceptance of Tilt-Up's performance and Gendler's partial payment to Tilt-Up, evidences that Star City did accept Tilt-Up's June 29 lump-sum bid price for its normal scope of work and the extra or changed work, all as set forth in Tilt-Up's December 15 letter.

Star City, however, asserts that "the difference between the purported oral agreement for the lump sum, and the agreement for the footings and foundation demonstrates that the parties had not reached a final, complete agreement based on the June 1993 price or bid along with the December 15 letter." Brief for appellant at 29. The evidence demonstrates that on January 14, 1994, Gendler faxed Miers a letter suggesting that $168,000 would be the appropriate price for the footings. On that same day, Miers

responded to Gendler's fax by stating that "[m]y original proposal included the footings at $120.00/yard which on most jobs is a fair number. . . . I would suggest $183,000.00 would be more appropriate for the footings to date." Eventually, Tilt-Up and Star City entered into an alleged agreement whereby $175,814 would be paid to Tilt-Up for the footings work.

We determine that the foregoing negotiations constituted proposals and counterproposals to amend the footings-price portion of the existing contract, rather than ongoing negotiations by the parties over terms to be included in the final contract. Thus, as will be discussed in the last section of this opinion, Tilt-Up is entitled to the reasonable value of the services performed and materials furnished on the footings portion of the contract, regardless of whether the parties' alleged amendment to the contract was mutually accepted.

In sum, we determine that Star City did enter into a lump-sum contract with Tilt-Up for Tilt-Up's normal scope of work, plus the extra and changed work authorized by Star City, as set forth in Tilt-Up's December 15 letter. Thus, Star City's first assignment of error is without merit.

### PRIME CONTRACTOR

In its next assignment of error, Star City argues that the trial court erred in finding that Tilt-Up was a prime contractor. Neb. Rev. Stat. § 52-127(8) (Reissue 1993) provides that a "prime contractor" is "any person who makes a real estate improvement contract with a contracting owner." A "contracting owner" is "a person who owns real estate and who, personally or through an agent, enters into a contract, express or implied, for the improvement of the real estate." § 52-127(3). While conceding that Star City was the owner of the real estate upon which the INS Project was constructed, Star City asserts that the evidence demonstrates that Tilt-Up's written contract, if one had been executed, would have been with Olympic General, the alleged prime contractor on the job, rather than with Star City, thereby making Tilt-Up a subcontractor and not a prime contractor.

Tilt-Up contends that Star City's argument with respect to any potential written contract between Olympic General and Tilt-Up is irrelevant. We agree. In the instant case, Tilt-Up did

not seek recovery on the theory that a written contract existed or would have been executed by certain parties. Thus, it is not the province of this court to speculate whether a written contract would have or should have been between Tilt-Up and Olympic General or between Tilt-Up and Star City. Accordingly, our sole inquiry is whether there is sufficient evidence in the record to demonstrate that Tilt-Up orally contracted with Star City's agents for Tilt-Up's construction services.

Agency is presumed between an employer and employee in determining whether an owner is a "contracting owner." Neb. Rev. Stat. § 52-128 (Reissue 1993). It is undisputed that Gendler was the president and an agent of Star City. It is further undisputed that Nicas was an employee of the Gendler companies, including Star City, and, thus, was also an agent of Star City.

In the instant case, it was Nicas who solicited pricing from Tilt-Up and provided most of the information necessary for Tilt-Up to formulate its offer on the INS Project. Furthermore, Gendler authorized and directed Tilt-Up to commence performance on the INS Project and, subsequently, observed and accepted portions of Tilt-Up's work. Finally, Gendler signed and sent the letter ordering Tilt-Up to terminate all construction activities on the INS Project. Therefore, we determine that Star City, the contracting owner, through its agents Nicas and Gendler, entered into an oral contract with Tilt-Up, thereby rendering Tilt-Up a prime contractor on the INS Project.

### SUBSTANTIAL PERFORMANCE

Star City next asserts that even if Star City entered into a contract with Tilt-Up, Tilt-Up is not entitled to a lien since it did not substantially perform the contract. In support of its assertion, Star City relies on *Lange Indus. v. Hallam Grain Co.*, 244 Neb. 465, 507 N.W.2d 465 (1993). In *Lange Indus. v. Hallam Grain Co.*, 244 Neb. at 473, 507 N.W.2d at 472, we stated that "[a] contractor cannot assert a mechanic's lien upon property where there has been only part performance or lack of substantial performance of the contract." Star City's reliance on *Lange Indus.*, however, is misplaced, since the foregoing proposition is predicated upon a situation in which the contractor defaults on a contract.

In *Lange Indus.*, we cited *Reeves v. Watkins*, 208 Neb. 804, 305 N.W.2d 815 (1981), for support of the foregoing proposition. In *Reeves*, the court relied on 53 Am. Jur. 2d *Mechanics' Liens* § 51 (1970), which provided that *a contractor who defaults* on a contract "'cannot successfully assert a mechanic's lien upon the property where there has been only part performance or a lack of substantial performance of the contract.'" 208 Neb. at 809, 305 N.W.2d at 819. However, in the situation where a contract has been terminated without fault on the contractor's part, a lien is preserved despite the failure of the contractor to complete the contract. See *Hulinsky v. Parriott*, 232 Neb. 670, 441 N.W.2d 883 (1989). See, also, 53 Am. Jur. 2d *Mechanics' Liens* § 247 (1996). To rule otherwise would allow an owner to terminate a construction contract prior to substantial performance by the contractor, whether in good faith or not, and escape construction lien liability. Such a rule is not consistent with the purpose of the Nebraska Construction Lien Act (NCLA), see Neb. Rev. Stat. §§ 52-125 through 52-159 (Reissue 1993). Therefore, in the instant case, since the evidence demonstrates that the contract was not terminated as a result of Tilt-Up's default on the construction contract, a construction lien is preserved despite the fact that Tilt-Up failed to complete the contract. Accordingly, this assignment of error is without merit.

### CONSTRUCTION LIEN AMOUNT

Star City next assigns that the trial court erred in awarding Tilt-Up a construction lien in an amount greater than the reasonable value of services performed and materials supplied on the INS Project. Section 52-136(1)(a) provides that "[t]he lien of a prime contractor is for the unpaid part of his or her contract price . . . ." "Contract price" means "the amount agreed upon by the contracting parties for performing services and furnishing materials covered by the contract, increased or diminished by the price of change orders or extras, amounts attributable to altered specifications, or breach of contract . . . ." § 52-127(2). Star City asserts that because the contract was not substantially performed, Tilt-Up is limited to a recovery for the reasonable value of the services performed and materials furnished on the INS Project. Tilt-Up, however, contends that according to the

language of § 52-136(1)(a), it is entitled to recover the unpaid portion of the contract price, which includes an amount attributable to breach of contract, notwithstanding the fact that it did not substantially perform the contract. Therefore, the issue we must determine is whether Tilt-Up is limited to a recovery for the reasonable value of services performed and materials furnished when it failed to substantially perform the contract.

While the language of § 52-136(1)(a), taken out of context, could be read to indicate that Tilt-Up is entitled to a lien for the unpaid part of its contract price even though it did not substantially perform the contract, we must bear in mind that in determining the meaning of a statute, we may conjunctively consider and construe a collection of statutes which pertain to a certain subject matter (i.e., the NCLA) to determine the intent of the Legislature, so that different provisions of the act are consistent, harmonious, and sensible. See *State ex rel. Wood v. Fisher Foods*, 254 Neb. 982, 581 N.W.2d 409 (1998). We note, as we undertake our statutory analysis, that it has long been the rule in Nebraska that when an owner has wrongfully interrupted a contractor and prevented the contractor from completing his or her work on a project, the contractor is entitled to a lien for the reasonable value of the labor he or she has performed and the material he or she has furnished, but the contractor cannot have a lien for the damages sustained from the breach of the contract. See *Pardue v. Missouri P. R. Co.*, 52 Neb. 201, 71 N.W. 1022 (1897) (interpreting former version of NCLA).

A review of several provisions of the NCLA reveals that the rule announced in *Pardue v. Missouri P. R. Co., supra*, has not been statutorily altered by the revisions to the act in 1981. First, according to § 52-126, the purpose behind the NCLA is to "create . . . a lien against real estate in favor of a person *furnishing* services or materials under a real estate improvement contract." (Emphasis supplied.) Second, § 52-131(1) provides that "[a] person who *furnishes* services or materials pursuant to a real estate improvement contract has a construction lien . . . ." (Emphasis supplied.) Finally, "contract price" is defined to mean "the amount agreed upon by the contracting parties for *performing* services and *furnishing* materials covered by the contract . . . ." (Emphasis supplied.) § 52-127(2).

The above provisions speak clearly as to the right to a construction lien only with respect to services performed or materials furnished, not with respect to services intended to be performed or materials intended to be furnished. Thus, because lost profits as a result of a breach of contract compensate a contractor for services not yet performed and materials not yet furnished, several provisions of the NCLA continue to preclude a lien for damages for the unpaid balance of a construction contract unless the contractor has substantially performed the contract. A number of other jurisdictions, interpreting similar provisions of their construction lien statutes, have likewise concluded that a statutory construction lien is not an appropriate vehicle for collecting damages for breach of contract because of the unique nature of the statutory remedy. See, *Gallo v. Sphere Const. Corp.*, 293 N.J. Super. 558, 681 A.2d 1237 (1996) (denying lien for lost profits because statutory right to such lien exists only with respect to services and materials actually furnished); *Fortune v. Superior Court*, 159 Ariz. 549, 552, 768 P.2d 1194, 1197 (Ariz. App. 1989) (denying lien for lost profits because Arizona's statutory scheme "gives lien rights only for 'work done and materials furnished,' overhead and profits [are] not within the purview of the act"); *CSR Contractors v. Kendall Constr.*, 45 Wash. App. 648, 726 P.2d 1018 (1986) (denying lien for lost profits because they compensate party for work not yet performed and standard for lien under Washington's statutory scheme is "work performed"); *Texas Bank & Trust Co. v. Campbell Bros., Inc.*, 569 S.W.2d 35, 42 (Tex. Civ. App. 1978) (denying lien for lost profits on work not performed because "a profit is secured by a statutory lien only to the extent that it may be considered compensation for services actually rendered as distinguished from the amount of the contractor's loss because of the owner's breach of the contract"); *Sea Pines Co. v. Kiawah Island Co., Inc.*, 268 S.C. 153, 159, 232 S.E.2d 501, 503 (1977) (holding that statutory mechanic's lien is not vehicle for collecting damages for breach of contract because "[t]he statute . . . secures a debt [only] 'for labor performed or furnished or for materials furnished and actually used' ").

Accordingly, we hold that a prime contractor is entitled to the unpaid part of his or her contract price under § 52-136(1)(a) when the prime contractor has substantially performed the contract; however, when the prime contractor has not substantially performed the contract or has been prevented from completing his or her work, the contractor is entitled to a lien for the reasonable value of the labor he or she has performed and the material he or she has furnished, but the contractor cannot have a lien for the damages sustained from the breach of the contract. Having so held, the question that remains is whether there is adequate evidence in the record of the reasonable value of the services performed and the materials furnished on the INS Project. In the instant case, exhibit 96 was admitted into evidence, over Star City's foundation objection, as to the amount due Tilt-Up for the reasonable value of the services performed and materials furnished on the INS Project. This amount was calculated as follows:

| | |
|---|---|
| $273,293 | Footings |
| 43,330 | Floor |
| 20,924 | Site work |
| 16,774 | Rockfill |
| 7,339 | Winter concrete |
| 11,062 | Footing rebar |
| 4,758 | Engineering |
| 22,222 | Special purchase extras |
| 11,187 | Finance charges claimed by lien claimants |
| -164,284 | Less payments already made |
| $246,605 | Total value of work performed |

On appeal, Star City argues that the exhibit lacked foundation on the basis that Tilt-Up's expert witness "simply took the 'cost' of the work done by [Tilt-Up], and added a 40 percent gross margin to come up with the 'value' . . . . The 40 percent gross margin was simply a rounded-off number used by Steve Miers as an estimate of his profit on other jobs . . . ." Brief for appellant at 41.

Contrary to Star City's assertion, Tilt-Up's expert witness, William Schwartzkopf, testified that he did not calculate the reasonable value of the services performed and materials fur-

nished by simply taking the cost of Tilt-Up's work and applying a 40-percent markup to it. Rather, Schwartzkopf testified that the $246,605 figure was based on the reasonable value of the services performed and materials furnished in direct proportion to the price stipulated for the whole of the work. Schwartzkopf testified that the profit that Tilt-Up expected to realize on the INS Project was not unreasonable, since

> [t]his is a contractor doing what is called [t]ilt-[u]p construction in a market where he is the only contractor doing that type of work and he is competing against companies that provide precast concrete that is manufactured off site in a multi-million dollar plant with a high fixed cost and has to be trucked to the site. The end product is very similar to the production method of casting it on site without a big investment and physical plant is considerably cheaper but the competing product is very expensive. So you can obtain a very high margin, a very high profit in that circumstance because your competitors have a much higher cost than you do, and it's not unusual in that circumstance to see a high profit margin.

While Schwartzkopf did make reference to three comparable projects in which Tilt-Up had performed for Gendler in the past and in which the average profit margin on the projects was 60 percent, Schwartzkopf testified that this reference was made only to generally test the reasonableness of his opinion as to the reasonable value of the labor Tilt-Up performed and material it had furnished. A contractor is entitled to a reasonable profit on the work performed that is secured by a construction lien, even though the profit is limited to the extent that it may be considered compensation for services actually rendered, as distinguished from the amount of the contractor's loss because of an owner's breach of contract.

On our de novo review of the record, we acknowledge that the trial court heard and observed the witnesses with respect to the issue of reasonable value of services performed and materials furnished, and accepted one version of the facts rather than another. See *Midlands Rental & Mach. v. Christensen Ltd.*, 252 Neb. 806, 566 N.W.2d 115 (1997). We note that Schwartzkopf's opinion was given significant weight by the trial court and con-

clude that Schwarzkopf's opinion of the amount due Tilt-Up for the reasonable value of the services performed and materials furnished is supported by the evidence, with one exception. Tilt-Up is not entitled to recover $11,187 in finance charges that were incurred as a result of Star City's refusal to pay Tilt-Up, since this amount does not compensate Tilt-Up for services performed or materials furnished. Therefore, in deducting that amount from $246,605, we determine that Tilt-Up is entitled to recover $235,418 from Star City as the reasonable value of services performed and materials furnished on the INS Project.

## CONCLUSION

For the foregoing reasons, we conclude that the district court correctly determined that Tilt-Up had a valid construction lien. However, upon our de novo review, we conclude that the district court erred in calculating the value of Tilt-Up's construction lien at full-contract damages, rather than at the reasonable value of services performed and materials furnished, since Tilt-Up did not substantially perform the contract. Therefore, we affirm the judgment of the district court; however, we modify the award to Tilt-Up to $235,418 for the reasonable value of services performed and materials furnished on the INS Project.

AFFIRMED AS MODIFIED.

WHITE, C.J., participating on briefs.