Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/01/2020 09:07 AM CDT

- 797 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

Freedom Specialty Contracting, Inc., appellee,
v. Nichol Flats, LLC, appellant.
___ N.W.2d ___

Filed September 1, 2020.    No. A-19-646.

1. **Mechanics' Liens: Foreclosure: Equity.** An action to foreclose a construction lien is one grounded in equity.
2. **Equity: Appeal and Error.** In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.
3. **Breach of Contract: Damages.** A suit for damages arising from breach of a contract presents an action at law.
4. **Judgments: Appeal and Error.** In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong.
5. **Contracts.** Contract clauses requiring that any modifications to the contract be made in writing are valid and enforceable in Nebraska.
6. **Contracts: Substantial Performance.** Substantial performance is shown when all the essential elements necessary for the full accomplishment of the purposes of the contract have been performed with such an approximation to complete performance that the owner obtains substantially what is called for by the contract.
7. **Mechanics' Liens.** Neb. Rev. Stat. § 52-136(1)(a) (Reissue 2010) speaks clearly as to the right to a construction lien only with respect to services performed or materials furnished, not with respect to services intended to be performed or materials intended to be furnished.

Appeal from the District Court for Douglas County: J. Michael Coffey, Judge. Affirmed as modified.

- 798 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

Megan S. Wright and Austin L. McKillip, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellant.

Patrick T. Vint and Todd W. Weidemann, of Woods & Aitken, L.L.P., for appellee.

Moore, Chief Judge, and Pirtle and Arterburn, Judges.

Pirtle, Judge.

## INTRODUCTION

Nichol Flats, LLC, appeals from a judgment of the district court for Douglas County in favor of Freedom Specialty Contracting, Inc. (Freedom), in the amount of $196,851.78. Freedom brought suit against Nichol Flats for foreclosure on a construction lien and for breach of contract. Nichol Flats brought a counterclaim for breach of contract and indemnification. After a bench trial, the district court found that Nichol Flats wrongfully terminated Freedom under the contract and that Freedom was entitled to foreclosure on its lien. The district court dismissed Freedom's contract claim and Nichol Flats' counterclaim with prejudice. For the foregoing reasons, we affirm as modified.

## BACKGROUND

In August 2015, Nichol Flats and Freedom entered into a contract whereby Freedom would provide framing and drywalling services during the construction of a five-story apartment complex on North 16th Street in Omaha, Nebraska. Exhibit B of the contract provided the following baseline schedule for the completion of Freedom's services:

| Floor | Duration | Start Date | Finish Date |
| --- | --- | --- | --- |
| Level 1 | 15 Days | 11/3/2015 | 11/23/2015 |
| Level 2 | 35 Days | 11/10/2015 | 12/28/2015 |
| Level 3 | 35 Days | 12/9/2015 | 1/26/2016 |
| Level 4 | 35 Days | 1/8/2016 | 2/25/2016 |
| Level 5 | 35 Days | 2/8/2016 | 3/25/2016 |

Due to delay by other subcontractors, and the need for certain work to be completed prior to framing and drywalling,

- 799 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

the parties agreed Freedom was incapable of adhering to the dates provided in the baseline schedule.

At some point in August 2016, prior to completion of the framing and drywalling, Freedom ceased performing work under the contract. The parties dispute the reason Freedom's work was terminated.

On October 27, 2016, Freedom filed suit for foreclosure on its construction lien in the amount of $262,469.04 and for breach of contract. On July 10, 2017, Nichol Flats filed an amended answer and counterclaim denying the allegations contained in Freedom's complaint and alleging that Freedom breached the contract and owed indemnification costs to Nichol Flats. A bench trial took place on May 13 through 16, 2019.

At trial, Freedom called John Jantzon, its project manager, as a witness. Jantzon testified that the construction manager, Tackett Company (Tackett), communicated with him regarding when the drywall work could commence. Under the contract, Freedom was to complete drywall for four floors of apartment units, and the metal framing on the first floor commercial space.

Jantzon testified that if other "trades" or inspections are delayed, it sets back Freedom's schedule because drywall work cannot be completed. Jantzon testified that exhibit B of the contract, the original baseline schedule, was the only schedule provided by Tackett and the only one he reviewed. No change order or construction change directive regarding Freedom's schedule was ever provided to Jantzon.

Jantzon testified that Freedom began its work after a May 19, 2016, lunch meeting that took place with representatives from Freedom, Tackett, and the Nichol Flats ownership. He acknowledged that some metal framing on the first floor was done previously in October 2015. Jantzon testified that there had been no discussion about amending Freedom's schedule prior to the meeting.

Jantzon denied that Tackett had notified Freedom that it could begin its work on May 15, 2016. He testified that the fifth floor was not ready at that time. Jantzon denied having ever

- 800 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

agreed to a 15-day-per-floor schedule, which was referenced in an email from Tackett's project manager, Trent Gumm.

Jantzon testified that errors by other contractors on the project caused Freedom to perform additional work outside the scope of its contract. A change order request for $14,842 to add soffits outside of Freedom's scope of work was refused by Nichol Flats. Another change order for $4,210 related to corridor soffits was refused. Change order requests for $2,291 and $1,107 were approved by Nichol Flats.

On August 11, 2016, Kirt Trivedi, a co-owner of Nichol Flats, sent Freedom an email stating, "This email is to provide Freedom the required seven day notice to meet the contractual schedule. This must be met or otherwise we will have to exercise other options." Jantzon testified that he had not previously received any notice from Nichol Flats, or Tackett, alleging that Freedom was behind schedule. He testified that there were ongoing issues with other contractors' work that prevented Freedom from completing the drywall on certain floors.

On August 16, 2016, Freedom received an email from Trivedi with a list of tasks to complete in order to avoid "supplement[ation]." Supplementation, in this context, refers to Nichol Flats' contractual right to outsource a portion of Freedom's scope of work upon default or delay by Freedom in breach of the contract. The purpose of supplementation is to complete work that has delayed the project's schedule. Jantzon testified that Trivedi's list encompassed essentially the remainder of Freedom's scope of work on the project. He testified that a supplementation crew arrived on August 17, but he denied instructing Freedom's workers to stop working on the project. The supplementation crew was an independent drywalling company hired to work alongside Freedom to meet the project's schedule.

Jantzon testified that despite supplementation, Freedom's president, Randy Tufly, instructed him to keep the Freedom crew on the jobsite. On August 18, 2016, Jantzon received a telephone call from Tufly indicating that Freedom was likely to get "thrown off the job" that day and that Jantzon should

- 801 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

gather Freedom's equipment. Jantzon went to the jobsite that afternoon and found a "sizeable crew" there in addition to Freedom's workers.

Jantzon did not return to the jobsite on August 19, 2016. Daniel Hermida, Freedom's jobsite foreman, told Jantzon that he was told if Freedom's workers entered the jobsite, they would be arrested. Freedom did not perform any work on the Nichol Flats project after August 18.

On cross-examination, Jantzon admitted that he did not provide a written schedule to Tackett in response to Gumm's May 24, 2016, email requesting a "written plan from [Freedom] as assurance that we will be completing the floors in 15 days as per our original scheduled dates." Jantzon acknowledged that neither Trivedi nor Deepak Gangahar, the co-owners of Nichol Flats, told him that Freedom was terminated on August 18, but Ryan Greenfield from Tackett called and told him that Freedom had been terminated.

Hermida testified that his duties as foreman included coordinating workers and ensuring the project was on schedule. Hermida testified that he did not have contact with Trivedi or Gangahar until August 18, 2016, Freedom's last day on the Nichol Flats jobsite. He denied any ongoing issues with staffing the project or meeting deadlines, and he indicated that no concerns were ever raised to him by Freedom, Tackett, or the Nichol Flats ownership.

Hermida testified that he was approached by Trivedi on August 18, 2016, and was told that Freedom was being supplemented. Hermida testified that Trivedi then asked, "'How fast can you get your things and your men off the job?'" Hermida said he ignored the question and walked away to call Freedom's office and spoke with Jantzon, who told Hermida to continue working. Hermida denied Trivedi's claim that Hermida "refused to work side by side with the supplementation team and instructed his team to remove tools and the entire team." Hermida indicated that he refused to give the supplementing contractor his personal blueprints and told him to keep his crew from using Freedom's equipment.

- 802 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

When Hermida arrived to the jobsite on August 19, 2016, Trivedi told him that Freedom was no longer allowed on the jobsite and that he owned everything inside, including Freedom's equipment. Hermida testified at length regarding the work Freedom had completed as of August 18, the last day it was on the jobsite, including the installing and finishing of the drywall on the third, fourth, and fifth floors.

Richard Ridpath, Freedom's commercial operations manager, testified that Jantzon reported to him on the Nichol Flats project. Ridpath testified that he scheduled a meeting with Trivedi for August 16, 2016, which he thought was to discuss Freedom's work on certain touchups. Ridpath testified that when he introduced himself, Trivedi screamed, "'Get off my floor. Get out of my building.'" Ridpath walked through the units on the third and fourth floors on his way out, and he said he believed the drywall was ready to be primed.

Sarah Tufly, Freedom's vice president of general operations, testified that she oversees human resources, initial contract review, and certain financial work for the company. Sarah testified that Freedom bills according to the estimated percentage of work completed on each project section on the applicable billing date. Under the contract, Freedom was required to submit its billing statements to Tackett by the 20th of each month. The billing would reflect the projected percentage of work completed for the entire month. Exhibit 40, an "Aging Detail by Job," reflects $210,599.11 plus $53,469.25 in retainage still owed to Freedom by Nichol Flats, according to Freedom's billing.

Sarah testified that invoices for $168,153.30 on July 20, 2016, and $42,445.81 on August 19 were submitted, but they had not been paid by the time of trial. Sarah testified that Freedom was over budget on the Nichol Flats project, largely due to the initial delays. Exhibit 40 also reflected an estimation that Freedom had completed 89 percent of the project when it stopped work. She explained that the report reflected a higher percent billed than percent of "actual completion"

due to verbal change orders that had not been formalized in writing and incorporated into the total contract price.

Sarah testified that Freedom's "monthly billing work-sheet" was used to determine Freedom's claimed damages of $262,469.04 within its construction lien. That number was reached by taking a total contract price of $570,294 (including unofficial change orders) and subtracting the $270,623.96 already paid to Freedom and Freedom's estimate that $37,201 worth of work was left to complete under the contract at the date of termination.

On cross-examination, Sarah acknowledged that at times, Freedom would bill slightly more than its actual completion percentage to cover its costs.

Randy, Freedom's president, testified that he is the only person at Freedom with the authority to terminate a contract or make the decision to walk off a job. He testified that he considered pulling Freedom off the Nichol Flats project due to delayed payments in April and May.

Randy testified that at the May 19, 2016, meeting, he discussed accelerating the project schedule, including both labor and payment, but denied agreeing to a 15-day-per-floor schedule. He described such a schedule as "pretty much impossible." Randy testified that up until the date of termination, he believed Freedom was performing satisfactorily and timely under the contract.

Randy testified that despite his belief that Freedom had been terminated on August 18, 2016, he sent Trivedi emails on the evening of August 18, as well as on August 26, maintaining that Freedom was "ready, willing, and able to complete the work" on the project. Nevertheless, Trivedi did not indicate that Freedom would be permitted to return to the job. Randy testified that he worked with Jim Tufly, Freedom's director of commerical operations, as well as Jantzon to approximate the amount of work Freedom had completed in order to determine an exact lien amount.

On cross-examination, Randy testified that he received an email from Gumm on May 20, 2016, reflecting the requested

"15 days/floor schedule," but he did not respond to express his disagreement with that schedule. He denied ever receiving a change order request to reflect a 15-day-per-floor schedule.

Randy testified that the only notice that Freedom was behind schedule would have come in emails sent by Trivedi, but he denied that Freedom ever fell behind schedule. On August 18, 2016, Freedom removed its equipment from the jobsite and Jim sent an email notice to Trivedi that Freedom would require a "newly negotiated contract" if it were to return to the site.

Randy acknowledged that Freedom overbilled $40,340 compared to the actual work completed at the time its work stopped, without accounting for change orders. Exhibit 133 included information related to Freedom's estimation of the value of its construction lien. Exhibit 148 reflected Freedom's estimation that it had completed 96.26 percent of the contract work at the time its work was stopped.

At the conclusion of Randy's testimony, Freedom rested. At that point, Nichol Flats moved for a directed verdict, which the court overruled.

Nichol Flats called Mike Tackett, the president of Tackett, as its first witness. Tackett served as the construction manager of the Nichol Flats project, managing the contracts, schedules, and vendors in that role. Mike testified that due to delay by the project's plumber, the subcontractors on the Nichol Flats project were not held to the original completion dates, but were still held to the durations within the original contracts.

On May 5, 2016, Greenfield with Tackett emailed Freedom, indicating that the fifth floor of the Nichol Flats project was ready for installation of drywall. Mike testified that based off of Greenfield's description, 90 percent of the drywall work could have been completed on the fifth floor at that time. Mike testified that the May 19 meeting was called due to delays in the drywall work and to discuss the expectation that each floor would be completed within a 3-week period, or 15 working days. He testified that "Freedom stated that [it] would handle the 15 days" and that he did not believe such timeline would be "impossible." Mike denied that bimonthly payments

were a condition that was agreed to for Freedom to meet the 15-day schedule.

Mike testified he never received notice that Freedom was being delayed due to incomplete inspections or that it was unable to "get the project stocked." Mike testified that a project schedule was continuously maintained throughout the project and that Greenfield and Gumm maintained and discussed the schedule with the subcontractors.

Mike testified that Freedom was supplemented on August 18, 2016, but Tackett did not terminate Freedom. He testified that no one at Tackett had the authority to do so. He also did not witness anyone from the Nichol Flats ownership order Freedom to discontinue its work on the project. Mike testified that at the time of supplementation, Freedom had only completed approximately 65 percent of its work under the contract.

Mike testified that Tackett prepared an assessment of liquidated damages on the project, which was introduced as exhibit 137, and reflected a 35-day contractual duration rather than the 15-day agreement he had previously testified was made. Exhibit 137 reflected an amount of $31,000 in liquidated damages assessed against Freedom.

On cross-examination, Mike testified that as construction manager, it was Tackett's responsibility to schedule and coordinate the work of various contractors on the project. It was also Tackett's responsibility to facilitate communication between contractors and the ownership and to review the contractors' applications for payment and change orders.

Mike agreed that under the original schedule, Freedom was allotted approximately 4 weeks between floors. He further agreed that the contract time for Freedom's work was to be measured from the date of commencement of its work. Mike testified that Freedom was originally scheduled to commence work on November 10, 2015, but work was delayed until May 9, 2016. Mike testified that the 15-day-per-floor schedule reduced the time between each floor "to about two weeks."

- 806 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

Johnathon Seffron, a construction representative with Anant Construction (Anant), an entity owned by Trivedi and Gangahar, testified that he helps manage construction projects on behalf of the property owners. Seffron attended the May 19, 2016, meeting with representatives from Freedom, Tackett, and Anant. He understood the project to be behind schedule on that date, specifically related to Freedom's scope of work. Seffron testified that Freedom indicated that it needed 3 weeks to complete each floor on the project. He testified that an agreement was made that Freedom would finish the drywall, from start to finish, on each floor within 15 working days.

Seffron testified that as of August 16, 2016, all the necessary inspections were complete on the third, fourth, and fifth floors. Seffron did not recall any existing issues on August 16 that would have interfered with Freedom's ability to complete its work throughout the duration of the project.

Mike Heidesch, an independent construction representative for Anant, testified that he was on the Nichol Flats jobsite every day during the project. Heidesch prepared exhibit 27, a daily field report, which reflects the number of Freedom workers (and its subcontractors) he counted on August 17, 2016. Exhibit 27 also reflects Heidesch's observations that Freedom was still in the process of hanging drywall on the third, fourth, and fifth floors on that date.

Exhibit 128 was introduced and includes photographs that Heidesch took on August 18, 2016, documenting the state of work Freedom completed on the project. Heidesch testified to various work that was incomplete as shown in the pictures. Heidesch testified that work left to be completed by Freedom included "drywall that needed to be hung, hollow metal frames, drywall finish and ceiling grid." Heidesch estimated that Freedom had completed 60 percent of its scope of work by August 18, when it stopped working on the project.

Trivedi, a co-owner of both Anant and Nichol Flats, testified that Nichol Flats is a mixed-use facility with 68 apartment units and a floor for commercial use. Trivedi acted as the

"owner's representative" under the terms of the contract with Freedom. Trivedi testified that a 15-day-per-floor schedule was agreed upon at the May 19, 2016, meeting. In his experience, this timeline was not unreasonable for these types of projects with proper staffing.

Trivedi testified that Nichol Flats consistently had issues getting lender approval of payment applications for the drywall work. These issues stemmed from the fact that the bank's inspector believed the drywall work was being overbilled.

Exhibit 108 is a change order request for Freedom to drywall the kitchen soffits that was denied by Nichol Flats. Trivedi testified that Freedom did not frame the soffits and only drywalled some, which he believed was part of their original scope of work. Under the contract, all change orders were to be signed by the ownership to be approved.

Exhibit 112 is a change order request for Freedom to frame corridor soffits that was denied by Nichol Flats. Trivedi testified that the change order was denied because that work was included under Freedom's contractual obligation.

Exhibits 113 and 114 are change order requests that were signed and approved by Nichol Flats and included in Nichol Flats' damages calculation.

Trivedi testified that on August 11, 2016, he emailed Freedom representatives to give them notice to get back on schedule within 7 days or Nichol Flats would "exercise other options" and supplement Freedom's work. Trivedi testified that other trades on the project were being held up because of Freedom's delays. Trivedi denied ever ordering Freedom off the project.

Trivedi testified that when Freedom was supplemented on August 18, 2016, Hermida made a telephone call and returned and told Trivedi that "we don't work with supplementing crews." He testified that Freedom workers then began to pack their equipment and load up their trucks. Trivedi denied firing Freedom or telling its crew to pack up their equipment. He testified that as of August 18, Freedom was "55 to 60 percent"

complete with its work. On August 25, without Freedom having returned to the jobsite, Trivedi emailed Freedom to give a 7-day notice that he was terminating the contract.

Trivedi testified that the cost to complete Freedom's scope of work was $318,370.49. Prior to the termination of the contract, Freedom had been paid $270,623.96 for its completed work. The contract, including the two signed change orders, was approximately $551,000, leaving a balance of $262,000. Trivedi testified that Nichol Flats sought to recover the difference between its costs incurred to complete Freedom's work and the remaining contract balance it would have paid Freedom. Trivedi testified that Nichol Flats incurred additional damages beyond the cost to complete Freedom's work, including accrued interest, loss of rent, and a higher interest rate on its funding due to refinancing. He testified that the lien Freedom filed reflects 96-percent completion by Freedom, which was "[n]ot even close" to what was actually completed.

On redirect examination, Trivedi testified that Freedom never proposed, nor requested, a new contract to work under if it were to return to the jobsite. Trivedi disputed the contention that Freedom completed 98 percent of material installation and 90 percent of total labor on the date of termination. He also disputed that Gangahar ordered Freedom to discontinue work. Trivedi testified that supplementation is difficult, costly, and used as a "last resort" and that he would not have supplemented Freedom had it actually been 90 to 98 percent complete as represented by Freedom.

Gangahar testified that he and Trivedi are business partners and have worked on a variety of projects together. He testified that after the initial delay, he met with Tackett in May 2016, reviewed the construction schedule, and determined that the drywall was the next trade to be performed. He indicated that despite the site being ready for drywall, "hardly anything was happening." Gangahar testified that at the May 19 meeting, he requested that Freedom explain the delay in work and provide a schedule for when its work would be complete. He testified

- 809 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

that Randy stated that Freedom needed 3 weeks per floor to do the drywall work.

Gangahar testified that he was present at the Nichol Flats site when Trivedi called a meeting and informed the crews working on the project that Freedom was being supplemented. Gangahar denied that he or Trivedi ever told Hermida that Freedom should discontinue its work on the project. Gangahar testified that the decision to supplement was considered over the course of days or weeks and was eventually made because Freedom was "[w]ay behind" schedule.

Gangahar opined that Freedom was near 60 or 65 percent complete with its scope of work on the day it was supplemented. Gangahar testified that Nichol Flats lost "hundreds of thousands of dollars" due to its inability to open and lease to student tenants in the fall.

On cross-examination, Gangahar testified that Freedom was notified on May 5, 2016, that the fifth floor at Nichol Flats was ready for drywall. He testified that Tackett was in continual communication regarding the status of the project and when Freedom would be able to begin work.

On redirect examination, Gangahar testified that he did not suggest allowing Freedom to resume work on the project because it would have required negotiating a new contract, he and Trivedi had already experienced issues with Freedom, and it would further delay the project.

After the conclusion of Gangahar's testimony, Nichol Flats rested. Nichol Flats renewed its motion for directed verdict, which the district court overruled. The district court then took the matter under advisement.

On June 20, 2019, the district court entered an order finding that the original contract durations governed Freedom's schedule on the project and that Freedom had complied with the contract. The district court also found that Nichol Flats wrongfully terminated Freedom in breach of the contract and that Freedom was entitled to $196,851.78 in damages—an amount reflecting its finding that Freedom completed 75 percent of the drywall work upon termination, as well as

- 810 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

75 percent of Freedom's construction lien. The district court dismissed Freedom's breach of contract action and Nichol Flats' counterclaim for breach of contract and indemnification. This appeal followed.

## ASSIGNMENTS OF ERROR

Nichol Flats assigns that the district court erred in (1) its determination that Freedom complied with the contract and was thus entitled to foreclose its construction lien, (2) its determination that Nichol Flats breached the contract, (3) its dismissal of Nichol Flats' breach of contract claim, and, alternatively, (4) its calculation of the construction lien amount.

## STANDARD OF REVIEW

[1,2] An action to foreclose a construction lien is one grounded in equity. *Lange Indus. v. Hallam Grain Co.*, 244 Neb. 465, 507 N.W.2d 465 (1993). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

[3,4] A suit for damages arising from breach of a contract presents an action at law. *Bloedorn Lumber Co. v. Nielson*, 300 Neb. 722, 915 N.W.2d 786 (2018). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Id*.

## ANALYSIS

### Freedom Complied With Contract

Nichol Flats first argues that the district court erred in its determination that Freedom complied with the contract and was entitled to foreclose its construction lien. We agree with the district court's finding that Freedom did not breach its

- 811 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
28 NEBRASKA APPELLATE REPORTS
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

obligations under the contract. The fundamental issue in this case is whether Freedom complied with the contract schedule for the completion of its work. Although both parties agree that the original contract dates were not adhered to, at no fault of Freedom, a central issue at trial was whether the written 35-day-per-floor schedule or the alleged oral 15-day-per-floor schedule controlled Freedom's obligations.

[5] First, we agree with the district court that the contract between Freedom and Nichol Flats required any modifications to be reduced to writing. Article I of the contract provided, in part: "The Contract may be amended or modified only by a written Modification signed by the Owner. No verbal amendments, waivers, changes, or other modifications of any kind will be enforceable." Contract clauses requiring that any modifications to the contract be made in writing are valid and enforceable in Nebraska. See, e.g., *Lueder Constr. Co. v. Lincoln Electric Sys.*, 228 Neb. 707, 424 N.W.2d 126 (1988) (enforcing clause requiring written change order to amend contract time). Therefore, it is clear to us that the 35-day-per-floor schedule, as contemplated by the original contract, controlled Freedom's contract schedule obligations.

Nichol Flats directs us to Freedom's "Location Time Card" records in arguing that the district court erred in finding that Freedom "was unable to commence its work until on or about May 20, 2016." Nichol Flats argues that the contract plainly states that the "Contract Time shall be measured from the date of commencement," and according to Freedom's own records, this date was prior to May 20, 2016. Article 3, § 3.1, of the contract provides:

> The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner. *(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

(Emphasis in original.)

- 812 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

As previously mentioned, all parties agree that the dates of exhibit B were not followed and that the initial delay was no fault of Freedom. The record before us reveals that no written amended schedule was ever agreed to between the parties, nor was one provided by the construction manager, Tackett. Therefore, it was incumbent upon the district court to determine the new "date of commencement" that Freedom's contract time was to be measured from. Although we acknowledge that this is an issue that we determine de novo on the record, our standard of review further provides that "where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another." *Lange Indus. v. Hallam Grain Co.*, 244 Neb. 465, 467-68, 507 N.W.2d 465, 469 (1993).

In this case, there was extensive testimony and evidence introduced at trial disputing the date of commencement. Although Nichol Flats argues that Freedom's contract durations should be measured from the date its workers first stepped foot on the jobsite, we disagree. Section 3.1 of the contract provides that either (1) the date of the agreement; (2) an inserted date (i.e., exhibit B); or (3) a date fixed in a notice to proceed, determines the date of commencement. After the schedule in exhibit B became infeasible, the parties did not agree to a new written schedule as required by the contract. Article I provides: "The Scope of the Work, Contract Sum, Contract Time, and other provisions of this Agreement are not subject to informal modification, whether by email, text message, verbal, etc. Only a properly executed Change Order, Construction Change Directive, and/or Modifications shall be recognized as binding upon the Parties."

At trial, representatives from Tackett, as well as Gangahar, the co-owner of Nichol Flats, testified that Freedom received "*notice*" on May 5, 2016, that it could commence work. Jantzon testified that Freedom was unable to commence work as of May 15 due to delay by other contractors and incomplete

- 813 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

inspections. Representatives from both parties testified that a meeting was held on May 19 between Nichol Flats, Freedom, and Tackett to "discuss [the] project schedule for drywall and the job in general." Based on the record before us, and the appropriate weight given to the fact that the district court heard and observed the witnesses, we agree that Freedom's "date of commencement" was on or about May 20.

Based on the May 20, 2016, date of commencement, we further agree with the district court that Freedom was in compliance with the contract terms, namely its contract schedule obligations, and was not in breach at the time it was terminated on August 18. Applying the original contract durations (excluding weekends and holidays), the "top floor down" approach taken by Freedom, and the May 20 date of commencement, Freedom's schedule would be as follows:

| Floor | Duration | Start Date | Finish Date |
|---|---|---|---|
| Level 5 | 35 Days | 5/20/2016 | 7/12/2016 |
| Level 4 | 35 Days | 6/20/2016 | 8/9/2016 |
| Level 3 | 35 Days | 7/19/2016 | 9/7/2016 |
| Level 2 | 35 Days | 8/16/2016 | 10/5/2016 |
| Level 1 | 15 Days | 8/23/2016 | 9/14/2016 |

Nichol Flats specifically takes issue with the 4-week duration allocated between floors, arguing that it "does not make any sense" and that "Freedom did not actually start the floors four weeks apart." Brief for appellant at 15. Although Nichol Flats argues that applying the 4-week gap between floors is contrary to the contract, it is precisely the contract where these durations come from. Exhibit B of the original contract provides 35 working days per floor and 4 weeks (20 working days) between the start dates of each floor. Because no amended written schedule was ever agreed to, the original contract durations controlled Freedom's obligations.

Based on the new date of commencement, and the appropriate contract durations, Freedom was not in breach on August 18, 2016, when it was terminated. Section 2.4 of the general conditions of the contract provides in part:

- 814 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

If [Freedom] defaults or neglects to carry out the Work in accordance with the Contract Documents and fails after receipt of written notice from the Owner to cure such default or neglect with diligence and promptness, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies.

No notice of default was provided to Freedom prior to August 11, 2016. As of August 11, Freedom was required to have completed work only on the fourth and fifth floors per the contract durations. In his email notice, Trivedi states that work on the second and third floors was incomplete and merely asked whether the fourth floor was complete. Work on the second and third floors was not yet due to be complete, and according to Tackett's calculation of liquidated damages, Freedom was completed with the fifth floor by July 20 and the fourth floor by August 1. Therefore, Freedom was not in breach of the contract schedule on August 18 when it was terminated from the Nichol Flats project.

Nichol Flats also argues that Freedom breached the contract by refusing to cooperate with the supplementing contractor. Nichol Flats directs us to § 6.1 of the contract in support of its argument, which provides:

§ 6.1.1 The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, which include persons or entities under separate contracts not administered by the Construction Manager, and to award other contracts in connection with other portions of the Project or other construction or operations on the site.

. . . .

§ 6.1.2 When the Owner performs construction or operations with the Owner's own forces including persons or entities under separate contracts not administered by the Construction Manager, the Owner shall provide for coordination of such forces with the Work of the Contractor, who shall cooperate with them.

- 815 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

Despite Nichol Flats' characterization of § 6.1 as permitting it to engage its "own forces" to complete any scope of work on the project, we agree with Freedom that such an interpretation "would render the contractual procedure for supplementation, requiring notice of breach and seven days to cure, moot." Brief for appellee at 24-25. This requirement is reflected in § 2.4 of the general conditions of the contract, as quoted above. Although Trivedi sent an email on August 11, 2016, purporting to provide notice to Freedom that if it did not "meet the contractual schedule" within 7 days, it would be supplemented, as discussed above, Freedom was not in breach of the contract schedule on August 11. Therefore, with no breach to cure, Nichol Flats' supplementation of Freedom on August 18 was improper.

[6] Nichol Flats also argues that the district court's finding that Freedom was 75 percent complete with its scope of work on August 18, 2016, when its work on the project stopped, demonstrates that Freedom was in breach and did not substantially perform. The majority of Nichol Flats' argument relies on its incorrect interpretation of the controlling contract schedule. For reasons previously discussed, we reject this argument. Nichol Flats also argues that the 75-percent-complete finding itself indicates Freedom did not substantially perform. "[S]ubstantial performance is shown when all the essential elements necessary for the full accomplishment of the purposes of the contract have been performed with such an approximation to complete performance that the owner obtains substantially what is called for by the contract." *Lange Indus. v. Hallam Grain Co.*, 244 Neb. 465, 474, 507 N.W.2d 465, 473 (1993).

However, Nichol Flats fails to consider that substantial performance should be measured against the contract durations of each floor, not against the contract as a whole, which the 75-percent-complete finding of the district court measures. Because we have already determined that Freedom was not in breach of the contract durations and, therefore, had substantially performed work on the fourth and fifth floors

- 816 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

by August 18, 2016, as the contract required, this argument also fails.

### Nichol Flats Breached Contract

Nichol Flats next argues that the district court erred in its determination that Nichol Flats breached the contract and that Freedom was entitled to recover under the construction lien. Nichol Flats argues that the decision "ignores relevant terms of the Contract, whether the termination is considered one for cause or for convenience." Brief for appellant at 21. We disagree.

Section 14.2 of the contract permitted Nichol Flats to terminate Freedom "for [c]ause." Section 14.2.1 allows termination under this provision if Freedom, as relevant here, was "guilty of material breach of a provision of the Contract Documents." We have already determined that Freedom did not commit a material breach of the contract as of August 18, 2016, when its work was terminated. Therefore, Nichol Flats was not entitled to terminate Freedom for cause under § 14.2.

Nichol Flats also argues that even if it was not permitted to terminate Freedom for cause, it was permitted to terminate the contract for "convenience" under § 14.4.1, which provides: "The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause." Although Nichol Flats was permitted to terminate Freedom for "convenience" at any point under the contract, the contract nevertheless provides that written notice should be given of the termination and that under § 14.4.3, "the Contractor shall be entitled to receive payment for Work executed, including reasonable overhead and profit on the Work executed." However, as Freedom argues in its brief, Trivedi made clear his intention was to terminate Freedom for cause. In his August 18, 2016, email, Trivedi wrote:

> Nichol Flats LLC will complete the scope with the supplementation team and will hold Freedom liable for any additional costs that may be incurred within their contractual scope. Since Freedom has refused to continue

- 817 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

work, no employee, associate, and/or affiliate of Freedom may not [sic] come on to property without my personal approval.

This is precisely the type of remedy provided for under § 14.2.2, allowing for termination for cause. There was conflicting testimony as to whether Freedom "refused to work" or whether Trivedi asked Freedom's jobsite foreman, Hermida, "'How fast can you get your things and your men off the job?'" and later refused to allow Freedom back on the jobsite. However, the district court found credible the evidence that Nichol Flats terminated Freedom. Again, we "may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another." *Lange Indus. v. Hallam Grain Co.*, 244 Neb. 465, 467-68, 507 N.W.2d 465, 469 (1993). Because Freedom was not in breach of the contract on August 18, 2016, when it was terminated by Nichol Flats, we agree with the district court that Nichol Flats committed a breach of the contract.

### Dismissal of Nichol Flats' Breach of Contract Claim

Nichol Flats next argues that the district court erred in its dismissal of its breach of contract claim. However, because this argument is wholly dependent on a finding that Freedom was in breach of the contract, this argument fails. We have already determined that Freedom was in compliance with the contract schedule and did not breach the contract. Therefore, it was not in error for the district court to dismiss this claim.

### Calculation of Construction Lien

Nichol Flats' final assignment of error, presented solely as an alternative to its previous arguments, is that the district court erred in its calculation of the construction lien amount. We agree. Although we affirm the finding of the district court that Freedom completed 75 percent of the adjusted contract, including written change orders, we modify its calculation of the amount of Freedom's construction lien.

- 818 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

[7] Under Neb. Rev. Stat. § 52-136(1)(a) (Reissue 2010), the appropriate calculation of a construction lien is "for the unpaid part of [the contractor's] contract price." The Nebraska Supreme Court has reiterated that § 52-136(1)(a) "speak[s] clearly as to the right to a construction lien only with respect to services performed or materials furnished, not with respect to services intended to be performed or materials intended to be furnished." *Tilt-Up Concrete v. Star City/Federal*, 255 Neb. 138, 153, 582 N.W.2d 604, 613 (1998). The district court made a factual finding, which we affirm, that Freedom completed 75 percent of its scope of work under the adjusted contract prior to being terminated. Therefore, the calculation of Freedom's construction lien should have reflected 75 percent of the adjusted contract price (minus amounts already paid), rather than 75 percent of Freedom's *claimed* construction lien amount. Based on this, we recalculate the amount of Freedom's lien as follows:

First, we determine the total value of the adjusted contract price by adding the original contract value with any approved change orders:

| | |
|---|---|
| Original Contract Price: | $547,844 |
| Change Order No. 1: | $2,291 (Approved) |
| Change Order No. 2: | $1,107 (Approved) |
| Change Order No. 3: | Not Approved |
| Change Order No. 4: | Not Approved |
| TOTAL ADJUSTED CONTRACT PRICE: | $551,242 |

Based on the district court's factual finding that Freedom completed 75 percent of its scope of work as of August 18, 2016, when it ceased work on the Nichol Flats project, which we affirm, we next multiply the adjusted contract price by 75 percent: Pro Rata Contract Amount: $551,242 × 75% = $413,431.50. Finally, to determine the amount owed to Freedom under its construction lien, we must subtract any payments previously made to Freedom by Nichol Flats, and the evidence shows this amount to be $270,623.96: Amount

- 819 -

Nebraska Court of Appeals Advance Sheets
28 Nebraska Appellate Reports
FREEDOM SPECIALTY CONTRACTING v. NICHOL FLATS
Cite as 28 Neb. App. 797

Owed: $413,431.50 − $270,623.96 = $142,807.54. Based on our recalculation of the value of Freedom's construction lien, we modify the district court's judgment in favor of Freedom from $196,851.78 to an amount of $142,807.54. The district court's order is otherwise affirmed, as modified.

## CONCLUSION

Based on the foregoing reasons, we affirm the district court's judgment to foreclose Freedom's construction lien. However, we modify the calculation of the lien amount to $142,807.54. We also affirm the district court's dismissal of Freedom's breach of contract claim and Nichol Flats' counterclaims for breach of contract and indemnification.

Affirmed as modified.